Luis A. Nieves y otros, demandantes y peticionarios, *v.* AM Contractors, Inc. y otros, demandados y recurridos.

*Número:* CC-1998-154 *Resuelto:* 2 de diciembre de 2005

*Julio Fontanet Maldonado*, abogado de la parte peticionaria; *Carlos Lugo Fiol*, procurador general, abogado de la parte recurrida.

LA JUEZA ASOCIADA SEÑORA FIOL MATTA emitió la opinión del Tribunal.

La revisión de la sentencia dictada en este caso por el entonces Tribunal de Circuito de Apelaciones (Tribunal de Apelaciones) nos requiere examinar las medidas tomadas por funcionarios del Estado Libre Asociado de Puerto Rico para controlar el acceso al complejo de vivienda Jardines de Quintana. Reafirmamos la validez constitucional del propósito preventivo y remedial que persigue el Estado al efectuar los llamados cierres de residenciales públicos. No

obstante, resolvemos que en este caso las actuaciones de los funcionarios gubernamentales al implantar y operar el sistema de control de acceso en Jardines de Quintana violan los criterios que hemos adoptado jurisprudencialmente para el cierre de urbanizaciones y para proteger la expectativa legítima de intimidad de los ciudadanos ante bloqueos de carreteras por las autoridades y son contrarias al debido proceso de ley garantizado por nuestra Constitución.

## I

El complejo de vivienda conocido como Jardines de Quintana consta de tres edificios con treinta y seis unidades de vivienda, un almacén y un centro comunal. Al presentarse el recurso que nos ocupa eran propietarios cien de los ciento ocho residentes del lugar. La Administración de Vivienda Pública era, a su vez, propietaria de las áreas comunes del complejo y A.M. Contractors, Inc. tenía a su cargo la administración y el mantenimiento de todo el sistema.[1] Jardines de Quintana está ubicado entre las calles Guayama y Francia en Hato Rey. La calle Irlanda lo separa del residencial público Juan César Cordero Dávila, conocido como Residencial Quintana. Antes de los hechos que provocan este recurso, había también una verja de cemento que servía de barrera física entre las dos comunidades.

Como parte de la política pública del Estado de controlar el tráfico de sustancias controladas y otros delitos, el 7 de septiembre de 1993, efectivos de la Policía y de la Guardia Nacional incursionaron en el Residencial Quintana. Establecieron casetas de vigilancia y se organizó el trán-

---

[1] En 1971 este complejo se incluyó en un programa conocido como "Turn Key III", mediante el cual se le otorgaba a sus residentes la oportunidad de firmar un contrato de arrendamiento con opción a compra. De este modo cien de los residentes del complejo advinieron propietarios de sus respectivos apartamentos.

sito vehicular y peatonal. Durante el operativo, se colocaron unas vallas para impedir todo acceso vehicular desde la calle Irlanda Oeste hasta la calle Francia. El 14 de noviembre de 1994 se removieron las vallas y en su lugar se instaló un portón fijo que impidió tanto el tráfico vehicular como el peatonal en esta intersección. El cierre permanente de la calle Irlanda Oeste (calle A) impidió el acceso directo de los residentes de Jardines de Quintana hacia la calle Francia.

A raíz de la intervención policíaca, se establecieron dos estructuras de control de acceso al Residencial Quintana. El primer puesto (control 1) consiste en una caseta de concreto, dos portones eléctricos para entrada y salida de vehículos y un portón peatonal. Este puesto está ubicado en el Residencial Quintana y provee acceso a la calle Francia, a través de la calle B, la cual es paralela a la calle Irlanda (calle A). El segundo puesto (control 2) consiste en una caseta de concreto, dos portones eléctricos para entrada y salida de vehículos, y un portón peatonal. Este puesto provee acceso a la calle Guayama por la calle Irlanda Norte (calle C). Al construirse este segundo control de acceso, se destruyó la verja de cemento que hasta entonces había separado al complejo Jardines de Quintana del Residencial Quintana.

Como resultado de lo anterior, Jardines de Quintana y el Residencial Quintana quedaron constituidos en una sola unidad residencial, en términos funcionales, con dos controles de acceso, uno en el Residencial Quintana propiamente dicho, que es el único acceso a la calle Francia, y otro en la intersección de la calle Irlanda y la calle Guayama.

*A los residentes de Jardines de Quintana no se les consultó sobre las medidas descritas ni el control de acceso antes de establecerlo.* Aunque se les ofrecieron tarjetas de identificación, libres de costo, para que tuvieran acceso al área controlada, los residentes decidieron no aceptarlas.

Es por esto que, según se desprende de la transcripción del juicio, los residentes de Jardines de Quintana sólo podían entrar a sus residencias a través del control 2, pues la entrada por el control 1 era para los residentes con tarjetas.

Tras las medidas de control de acceso y cierre, ocho[2] residentes de Jardines de Quintana presentaron una demanda sobre sentencia declaratoria e *injunction* permanente. Alegaron, en síntesis, que al impedirse el acceso vehicular y peatonal directo desde la calle Irlanda Oeste hacia la calle Francia, se les privó de su vía principal de acceso a los servicios esenciales localizados en esa calle. Además, fueron víctimas de actuaciones de los policías a cargo del cierre, que son arbitrarias y en clara violación de sus derechos constitucionales.

El 18 de mayo se celebró la vista en su fondo ante el Tribunal de Primera Instancia. Según *los peticionarios, las personas que transitan a través del segundo puesto de control de acceso (control 2) y no poseen la tarjeta que los identifica como residentes, quedan sujetas a las detenciones y los registros de la Policía.*

Por otro lado, al cerrarse la calle Irlanda Oeste de forma permanente, los residentes ya no tienen acceso directo a la calle Francia y, como señaló el foro de instancia en sus determinaciones de hechos, "[p]ara lograr acceso a la parte superior de la Calle Francia, los vecinos de Jardines de Quintana tienen que necesariamente atravesar toda la extensión del Residencial Público Quintana. La prueba indicó que este trecho es uno extenso, colmado de peligros para los transeúntes". Además, el acceso a la calle Francia es de gran importancia para los residentes de Jardines de Quintana, porque en esta calle está localizada la escuela de algunos hijos de residentes, la iglesia a la que asisten muchos de ellos, la transportación pública y una variedad

---

[2] Según la transcripción del juicio celebrado el 8 de mayo de 1997, la demandante Sra. Santa Rolón Suárez falleció antes de dicha vista.

de establecimientos comerciales como farmacias y colmados.

La falta de acceso peatonal y vehicular de manera directa hacia la calle Francia es de vital importancia para los residentes, ya que, según la prueba vertida en el juicio, muchos de ellos sufren frecuentes quebrantos de salud o tienen impedimentos físicos. Además, según estableció el foro de instancia en sus determinaciones de hechos, la mayoría de los residentes de Jardines de Quintana tenían, para la época en que se originó este caso, cincuenta y cinco años de edad o más, sesenta y cinco de las ciento ocho familias recibían los beneficios de seguro social y entre nueve y quince de los residentes utilizaban un sillón de ruedas para moverse.

Celebrada la vista, que incluyó una inspección ocular, el Tribunal de Primera Instancia declaró "con lugar" la demanda y ordenó al Administrador de Vivienda Pública y al Secretario de la Vivienda eliminar el portón fijo que fue instalado en la calle Irlanda Oeste y reinstalar, a su costo, la verja de cemento que dividía el complejo de viviendas Jardines de Quintana del Residencial Quintana. Además, ordenó al Estado Libre Asociado de Puerto Rico (ELA) que satisficiera a los peticionarios la suma de $100,000 en concepto de sufrimientos mentales.

Inconforme, el ELA acudió al Tribunal de Apelaciones y éste revocó en su totalidad la sentencia dictada por el Tribunal de Primera Instancia y desestimó la demanda presentada por los residentes de Jardines de Quintana. Éstos, a su vez, han recurrido ante este Tribunal, para alegar que el foro apelativo erró al resolver que: (1) la Ley Núm. 21 de 20 de mayo de 1987, según enmendada, 23 L.P.R.A. sec. 64 *et seq.*, no aplica a este caso; (2) las actuaciones del ELA fueron válidas; (3) no procedía la reconstrucción de la verja destruida por el Estado como parte de su operativo, y (4) el Estado es inmune contra reclamaciones de daños por sus actuaciones en este caso.

Por los fundamentos que explicamos a continuación, revocamos en su totalidad la sentencia del Tribunal de Apelaciones.

## II

Los peticionarios señalan, en primer lugar, que el foro apelativo intermedio erró al resolver que la Ley Núm. 21, *supra*, no aplica a este caso. Sin embargo, si aplicamos la norma básica de hermenéutica que nos requiere interpretar una ley, no en forma fraccionada sino integralmente, a la luz de su propósito, tenemos que concluir que los peticionarios no tienen razón. *Pueblo v. Ríos Dávila*, 143 D.P.R. 687 (1997); *Mun. San Juan v. Banco Gub. Fomento*, 140 D.P.R. 873 (1996); Art. 14 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 14.

■ La Ley Núm. 21, *supra*, provee un mecanismo para autorizar a urbanizaciones y comunidades residenciales a controlar la entrada a sus calles, siempre que cumplan con ciertos requisitos. El propósito principal de esta ley es proveer a la ciudadanía un instrumento adicional para combatir la criminalidad, procurando su participación activa en la lucha contra el crimen, cosa que "al mismo tiempo disminuye la labor de vigilancia, ya sobrecargada, que presta la Policía de Puerto Rico". Exposición de Motivos de la Ley Núm. 21, *supra*, 1987 Leyes de Puerto Rico 67. Véase *Caquías v. Asoc. Res. Mansiones Río Piedras*, 134 D.P.R. 181 (1993).

■ La ley dispone el procedimiento que deben seguir las comunidades para obtener el permiso o la autorización de control de acceso. 23 L.P.R.A. sec. 64(b). Hemos resuelto que "la Ley de Control de Acceso delega poder tanto a los municipios como a las asociaciones de residentes para poner en vigor la legislación". *Asoc. Ctrl. Acc. C. Maracaibo v. Cardona*, 144 D.P.R. 1, 26 (1997). A los municipios se les

delega la facultad de reglamentar y conceder los permisos conforme a los procedimientos y criterios esbozados en la propia ley y en el reglamento de planificación aplicable. Las asociaciones de residentes debidamente registradas en el Departamento de Estado y autorizadas por el municipio están facultadas para administrar y mantener los sistemas de control del tráfico y del uso de las vías públicas. Íd.

En su primera sección, la Ley Núm. 21, *supra*, autoriza a los municipios a conceder permisos para "el control del tráfico de vehículos de motor y del uso público de las vías públicas en paseos peatonales, calles, urbanizaciones y comunidades residenciales, públicas o privadas ...". 23 L.P.R.A. sec. 64. La ley contempla únicamente situaciones en las que los residentes de una comunidad específica se organizan en asociaciones, consejos o juntas que solicitan tales permisos, luego de estar debidamente inscritas en el Departamento de Estado como instituciones sin fines de lucro. 23 L.P.R.A. sec. 64a.

El estatuto no contempla situaciones como la que tenemos ante nuestra consideración. En este caso, la Guardia Nacional y la Policía de Puerto Rico clausuraron las entradas al Residencial Quintana en virtud del poder otorgado por las Órdenes Ejecutivas OE-1992-65 y OE-1993-08, para regular el tránsito vehicular y peatonal de una vía pública y así atacar el problema de criminalidad y el tráfico de drogas. Esta situación resulta, pues, del ejercicio del poder de razón del Estado, bajo el cual los funcionarios de la Rama Ejecutiva del E.L.A. efectúan el deber y la función general del Primer Ejecutivo de cumplir y hacer cumplir con las leyes.

Siendo ello así, es forzoso concluir que la Ley Núm. 21, *supra*, no rige la controversia planteada en este caso. Según explicamos, tanto la letra de la ley como la expresión del propósito legislativo van dirigidas a las actuaciones de los propios residentes de las comunidades y

no a las del Estado.([3]) Actuó correctamente el Tribunal de Apelaciones al resolver que la Ley Núm. 21, *supra*, no rige en este caso.

## III

El segundo señalamiento de error de los peticionarios gira en torno a la constitucionalidad de las actuaciones del Estado. Alegan que los funcionarios violentaron sus derechos a la intimidad, a la dignidad, a la libertad de expresión y culto, y a no ser objeto de registros y allanamientos irrazonables. Además, alegaron que las actuaciones del Estado violaron el debido proceso de ley de los residentes de Jardines de Quintana. Según concluyó el Tribunal de Primera Instancia, los peticionarios no han cuestionado la facultad constitucional del Gobernador para activar las milicias en situaciones de emergencia que constituyen un riesgo a la seguridad pública.([4]) Plantean más bien que dicha activación no justifica tomar medidas que priven a los ciudadanos de derechos fundamentales garantizados por la

---

([3]) Sin entrar en una discusión sobre la aplicación retroactiva de las leyes, cabe mencionar, por su pertinencia al asunto que examinamos, que mediante la Ley Núm. 336 de 30 de diciembre de 1998 (23 L.P.R.A. sec. 64c), nuestra Asamblea Legislativa añadió un tercer párrafo a la Sec. 5 de la Ley Núm. 21 de 20 de mayo de 1987, según enmendada, 23 L.P.R.A. sec. 64c:

"Las disposiciones de esta sección no son de aplicación a las actuaciones del Estado en su función de reglamentar el tráfico y acceso vehicular y peatonal a las urbanizaciones, calles [y/o] comunidades residenciales públicas y privadas, por razón de la seguridad, salud o bienestar general, incluyendo, sin que se entienda como una limitación, a las operaciones de la Policía de Puerto Rico o de la Guardia Nacional de Puerto Rico cuando dichas fuerzas sean movilizadas por las autoridades pertinentes para actuar en apoyo de las fuerzas de seguridad pública, en operaciones para combatir la criminalidad y el narcotráfico, o restablecer la seguridad pública ...."

*El propósito expreso de la Asamblea Legislativa es establecer, categóricamente, que dicha ley no aplica a las actuaciones estatales, como los operativos de rescate de los residenciales públicos de alta incidencia criminal.* Exposición de Motivos de la Ley Núm. 336 de 30 de diciembre de 1998.

([4]) Conforme a la Sec. 206 de la Ley Núm. 62 de 23 de junio de 1969, según enmendada, 25 L.P.R.A. sec. 2057, el Gobernador de Puerto Rico será el comandante en jefe de las fuerzas militares de Puerto Rico. Disponen, a su vez, las Secs. 207 y 225 que éste podrá ordenar la movilización de las fuerzas militares cuando cualquier perturbación grave del orden o de la seguridad pública lo requiera y cuando las autoridades civiles no pudieran afrontarlas. 25 L.P.R.A. secs. 2058 y 2076.

Constitución, especialmente en ausencia de prueba demostrativa de que existe una situación de emergencia.

Las actuaciones de los funcionarios del Ejecutivo en este caso, a saber, la Policía y la Guardia Nacional, se produjeron en virtud de una serie de órdenes ejecutivas promulgadas por el Gobernador de Puerto Rico. Dichas órdenes intentaban responder al acelerado aumento en el índice de la criminalidad y el tráfico de sustancias controladas, mediante la incursión de funcionarios del orden público en los residenciales públicos de más alta incidencia criminal. Mediante estas órdenes ejecutivas se desarrolló un programa de prevención del crimen al cual se integró no sólo la Policía de Puerto Rico y la Guardia Nacional, sino numerosas agencias públicas.

La Orden Ejecutiva OE-1992-65 estableció el proyecto del "rescate" de residenciales públicos y creó un "Plan de Acción Inmediata de servicios a residenciales de alta incidencia criminal con el objetivo de reducir la criminalidad en los residenciales públicos más afectados". Dicho plan estaría a cargo de un coordinador adscrito a la Administración de Vivienda Pública, con el apoyo de un comité asesor integrado por los jefes de esa Administración, el Departamento de Servicios Sociales, el Departamento de Servicios contra la Adicción, el Departamento de Recreación, el Departamento de Justicia y la Policía de Puerto Rico. La orden concedía facultad al comité asesor, en conjunto con el coordinador, para determinar los residenciales públicos que debían incluirse en el plan de acuerdo con su nivel de incidencia criminal, solicitar la ayuda y el personal necesarios, y recabar de entidades privadas la ayuda necesaria para la consecución del plan. El plan promovía el desarrollo de estrategias creativas e innovadoras, mediante la coordinación de los recursos de las entidades públicas y privadas, con miras a reducir la incidencia criminal en las comunidades afectadas. Véase OE-1992-65, promulgada el 6 de noviembre de 1992.

La OE-1993-08 expresa que debido a un aumento en el tráfico de drogas, la Policía de Puerto Rico "no da abasto". Por tal razón, dispone que se integre al servicio militar activo a los miembros de la Guardia Nacional que fueran necesarios para brindarle ayuda a la Policía de Puerto Rico en funciones dirigidas al control del tráfico de narcóticos. El Ayudante General de Puerto Rico sería el responsable de la operación militar y de los efectivos, las armas y los servicios que han de usarse. Los miembros de la Guardia Nacional proveerían, entre otros, servicios de transportación, de vigilancia, de médicos y de seguridad. Véase OE-1993-08, promulgada el 25 de febrero de 1993.

Se autorizó, además, el desembolso de fondos con el propósito de poder ejecutar la OE-1993-08. Véase OE-1993-22, promulgada el 4 de junio de 1993. La OE-1993-22 reitera que el objetivo es movilizar los recursos de las fuerzas militares de Puerto Rico para mantener la ley y el orden, y garantizar la seguridad de la vida y la propiedad del Gobierno y los ciudadanos.

Las órdenes ejecutivas a las que hemos hecho referencia expresan claramente la política pública de desarrollar nuevos programas de prevención, con el objetivo de reducir la incidencia criminal en los residenciales públicos y mejorar la calidad de vida de sus residentes. No se trata de que el Estado intervenga con un individuo con el único fin de incautarse de evidencia criminal o con la intención general de hacer cumplir las leyes; la naturaleza preventiva de la política pública adoptada en las órdenes ejecutivas reseñadas es evidente.

No nos corresponde pasar juicio sobre la sabiduría de la política pública así establecida ni los medios escogidos por el Gobernador para implantarla. *Asoc. Ctrl. Acc. C. Maracaibo v. Cardona*, supra. Como intérprete final de la Constitución y de las leyes del Estado Libre Asociado de Puerto Rico, la función indelegable de este Tribunal se activa cuando las determinaciones de política pública y las

correspondientes actuaciones de las otras dos ramas de Gobierno confluyen con los derechos individuales garantizados por nuestra Constitución. Véase *Silva v. Hernández Agosto*, 118 D.P.R. 45 (1986). Examinemos a continuación aquellos derechos fundamentales de los peticionarios que se encuentran afectados por las actuaciones gubernamentales antes descritas.

## IV

Los peticionarios plantean que las actuaciones del Estado vulneran el derecho a la intimidad de los residentes de Jardines de Quintana y sus visitantes. Este derecho emana de la Sec. 8 del Art. II de la Carta de Derechos de la Constitución del Estado Libere Asociado de Puerto Rico, L.P.R.A., Tomo 1, y del principio de inviolabilidad de la dignidad del ser humano consagrado en la Sec. 1 de dicha Carta de Derechos, L.P.R.A., Tomo 1.[5] La salvaguarda de este derecho es el propósito y fundamento para la protección contra registros y allanamientos irrazonables dispuesta en la Sec. 10 del Art. II de nuestra Constitución, L.P.R.A., Tomo 1.[6] Hemos resuelto que el derecho a la intimidad es de considerable envergadura y goza de la más alta jerarquía en nuestro entramado de derechos constitucionales. Véanse: *Vega et al. v. Telefónica*, 156

[5] Disponen dichas secciones lo siguiente:
"La dignidad del ser humano es inviolable. Todos los hombres son iguales ante la ley...." Art. II, Sec. 1, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1999, pág. 257.
"Toda persona tiene derecho a protección de ley contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar." Art. II, Sec. 8, Const. E.L.A., *supra*, pág. 301.

[6] Dicha sección dispone lo siguiente:
"No se violará el derecho del pueblo a la protección de sus personas, casas, papeles y efectos contra registros, incautaciones y allanamientos irrazonables. ... Sólo se expedirán mandamientos autorizando registros, allanamientos o arrestos por autoridad judicial, y ello únicamente cuando exista causa probable apoyada en juramento o afirmación.... Evidencia obtenida en violación de esta sección será inadmisible en los tribunales." Art. II, Sec. 10, Const. E.L.A., *supra*, págs. 310–311.

D.P.R. 584 (2002); *Pueblo v. Santiago Feliciano*, 139 D.P.R. 361 (1995); *Arroyo v. Rattan Specialties, Inc.*, 117 D.P.R. 35 (1986).

■ Sin embargo, el derecho a la intimidad no se ejerce en el vacío, sino "en el centro mismo de nuestros vecindarios y, por ende, su práctica no está inmune a la intervención moderadora del Estado". *Asoc. Ctrl. Acc. C. Maracaibo v. Cardona*, supra, pág. 31. Hay que tener presente que, de ordinario, debe tolerarse cierto grado razonable de intromisión en la intimidad ciudadana, cuando así lo exijan problemas apremiantes de salud y de seguridad pública. Íd. Véase, además, *E.L.A. v. Coca Cola Bott. Co.*, 115 D.P.R. 197 (1984). Por tal razón, en *Asoc. Ctrl. Acc. C. Maracaibo v. Cardona*, supra, este Tribunal afirmó la constitucionalidad de la llamada Ley de Control de Acceso, antes discutida. Tomando en consideración tanto el derecho a la intimidad como el interés del Estado en procurar la participación ciudadana en la lucha contra el crimen, establecimos unos parámetros que permiten a las asociaciones de residentes controlar el acceso a sus áreas residenciales con un mínimo de intervención con la privacidad. *Asoc. Ctrl. Acc. C. Maracaibo v. Cardona*, supra.

■ Además, concluimos que "controlar", en el contexto allí examinado, implica regular o vigilar el acceso a las vías, pero "no equivale a una incautación de la persona". *Asoc. Ctrl. Acc. C. Maracaibo v. Cardona*, supra, pág. 36. Hicimos énfasis en que la Ley de Control de Acceso no autorizó a las asociaciones de residentes a efectuar arrestos o registrar a las personas o automóviles. Manifestamos que las compañías de seguridad privadas sólo podrán efectuar arrestos o registros válidos como personas particulares en aquellas circunstancias en que nuestro ordenamiento procesal vigente permite tales arrestos. Por esa razón, no fue necesario analizar la Ley de Control de

418

Acceso a la luz de la Sec. 10 del Art. II de nuestra Constitución, *supra*.(7)

El caso que hoy nos ocupa presenta la situación contraria. Estamos ahora ante una actuación gubernamental en la que la Policía y la Guardia Nacional controlaron los accesos a las calles principales de una comunidad. Tratándose de una actuación gubernamental, debemos examinarla a la luz de la referida Sec. 10 del Art. II de nuestra Constitución, que delimita el grado de intrusión estatal permisible en el ámbito de intimidad individual.

■ Sabemos que el criterio rector para evaluar la constitucionalidad de una acción estatal determinada es la razonabilidad. A su vez, para determinar si la acción gubernamental es razonable, es imprescindible precisar la expectativa de intimidad que puede albergar una persona en determinadas circunstancias. Si se reconoce que en cierto contexto hay una expectativa legítima de intimidad, cualquier actuación gubernamental que pretenda interferir en ese ámbito debe ser razonable, de acuerdo con las circunstancias específicas del caso. En otras palabras, mientras mayor sea la expectativa legítima de intimidad, mayor será la restricción al Estado. De ahí que el análisis se haga de acuerdo con la doctrina de balance de intereses, sopesando los intereses del Estado frente a los derechos individuales. Véase *Pueblo v. Lebrón*, 108 D.P.R. 324 (1971).

■ Indiscutiblemente, hay una expectativa legítima de intimidad con respecto a un automóvil, aunque la consiguiente protección constitucional tiene un alcance menor. *Pueblo v. Yip Berríos*, 142 D.P.R. 386 (1997); *Pueblo*

---

(7) Nuestra decisión, sin embargo, no excluyó la posibilidad de que una intervención en las entradas de la comunidad que alcance el grado funcional de un arresto o una incautación de la persona active la protección de la Sec. 10 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico, *supra*. Esto sucedería cuando, a la luz de la totalidad de las circunstancias que rodean el incidente, una persona razonable no se hubiese sentido en libertad para marcharse del lugar. *Asoc. Ctrl. Acc. C. Maracaibo v. Cardona*, 144 D.P.R. 1, 36–37 (1997).

*v. Malavé González*, 120 D.P.R. 470 (1988); *Pueblo v. Sosa Díaz*, 90 D.P.R. 622 (1964). Por eso, como regla general, se requiere algún grado de sospecha centrada para poder efectuar detenciones vehiculares válidamente. En *Pueblo v. Yip Berríos*, supra, pág. 411, reconocimos que en ciertas y limitadas circunstancias el requisito de causa probable para detenciones vehiculares podría resultar en una carga demasiado onerosa para la protección del interés público. Adoptamos entonces los siguientes criterios, para determinar la razonabilidad de tales intervenciones:

(1) la magnitud del interés público que motiva la realización del bloqueo; (2) el grado con que éste adelante dicho interés, y (3) el alcance de la intrusión con la intimidad. (Énfasis suprimido.) *Pueblo v. Yip Berríos*, supra, pág. 411.

La evaluación de los hechos y las circunstancias de cada caso a la luz de dichos criterios es determinante para decidir si la disminución en el alcance de la protección constitucional resulta razonable. De esa forma, para determinar la validez de los bloqueos de carreteras en nuestra jurisdicción hay que sopesar su razonabilidad, de acuerdo con los hechos específicos de cada caso. *Pueblo v. Yip Berríos*, supra. Además, hemos sostenido, como norma general, que "la utilización de bloqueos de carreteras con propósitos generales [de hacer cumplir la ley] es ilegal. De igual modo, el Estado no puede postular la existencia de un objetivo legítimo como pretexto para adelantar objetivos que no satisfacen el escrutinio constitucional". Íd., pág. 411.

Esta norma es compatible con la jurisprudencia federal. En *Indianapolis v. Edmond*, 531 U.S. 32 (2000), el Tribunal Supremo de Estados Unidos invalidó una práctica de la ciudad de Indianápolis de efectuar bloqueos de carreteras con el propósito expreso de combatir el tráfico de narcóticos ilegales. El Tribunal Supremo federal concluyó que la detención de los vehículos de motor en tales circunstancias constituye una incautación que activa la protección de la

Cuarta Enmienda Federal. Al sopesar los intereses para determinar la razonabilidad de tal práctica, el Tribunal consideró, primero, si el objetivo principal del bloqueo era suficiente para justificar el grado de intrusión en la intimidad individual que supone la detención de un vehículo de motor. Reconoció que sólo se han admitido excepciones muy limitadas a la regla que exige algún grado de sospecha centrada para que la detención de una persona sea razonable y concluyó que el interés general en combatir el tráfico de drogas no es una excepción. Entendió el Tribunal Supremo federal que si se valida una práctica tan altamente generalizada, serían pocas las salvaguardas contra la potestad de las autoridades para efectuar bloqueos de carreteras, siempre que éstos pudieran vincularse en algún grado al propósito de hacer cumplir las leyes. En tal caso, la Cuarta Enmienda de la Constitución de Estados Unidos de América, análoga a la Sec. 10 del Art. II de nuestra Constitución, *supra*, poco serviría para evitar que tales intrusiones en la intimidad se conviertan en una práctica cotidiana.

▪ Una vez se establece que existe un objetivo estatal válido, es necesario determinar en qué medida el bloqueo adelanta el interés público que se desea proteger. Como regla general, la disponibilidad de alternativas menos onerosas y menos lesivas, que adelanten igualmente los objetivos gubernamentales, justifica invalidar el bloqueo. *Pueblo v. Yip Berríos*, supra, pág. 412.[8] Esto nos lleva al tercer elemento que debe incluirse en el balance de intereses para determinar la razonabilidad de un bloqueo de carreteras: el alcance de la intrusión en la intimidad. Íd., pág. 413.

---

[8] Véase *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444 (1990). La detención de vehículos en bloqueos de carretera con el fin de reducir los accidentes causados por conductores ebrios, adelanta el interés público de manera directa; permite identificar y sacar de la carretera al conductor ebrio en el momento, previniendo así un posible accidente.

■ El grado de lesión a la intimidad en estos casos debe ser el mínimo necesario para adelantar el interés estatal. Esto se determina mediante un doble análisis, con dimensiones tanto objetivas como subjetivas. *Pueblo v. Yip Berríos*, supra. Desde el punto de vista objetivo, la intrusión a la intimidad individual consiste en la detención propiamente dicha, la inspección visual y cualquier tipo de intercambio entre los agentes y el detenido. Íd., pág. 404. Por otra parte, desde la perspectiva subjetiva, la intrusión se caracteriza por el sentimiento de aprehensión, temor o sorpresa que ocasiona la detención. Íd.

En *Asoc. Ctrl. Acc. C. Maracaibo v. Cardona*, supra, establecimos el máximo de intromisión a la intimidad individual permisible para que las detenciones en las entradas de comunidades residenciales puedan considerarse razonables. En virtud de la *similitud del interés* que se interesa proteger mediante el control de acceso establecido en el caso ante nos, extendemos a éste los parámetros constitucionales que establecimos en aquél para minimizar la intrusión a la intimidad desde el punto de vista objetivo.

■ Acorde con lo resuelto en *Asoc. Ctrl. Acc. C. Maracaibo v. Cardona*, supra, págs. 38–40, cuando se pretende detener un vehículo de motor o a un peatón en la entrada de un área residencial:

1. Las indagaciones deben limitarse a preguntar a dónde se dirige el residente no identificado o visitante o, en su defecto, el propósito de la visita.

2. Se podrá indagar sobre la identidad del residente o del visitante no reconocido como tal, y mantener un registro de los visitantes, cuando el residente preste su consentimiento expreso. De ser éste el caso, la información registrada se limitará a aquella que es perceptible a simple vista, como son las horas de entrada y salida, las características del vehículo y la tablilla.

3. En ausencia de sospecha centrada, *no se debe detener al conductor de un vehículo para examinar la licencia de*

*conducir.* Como método menos oneroso para confirmar la identificación de la persona, se puede anotar el número de tablilla del vehículo de motor, que está a simple vista.

4. En ningún momento se puede negar el acceso a las calles controladas para el ejercicio de actividades constitucionalmente protegidas, tales como: la libertad de expresión, libertad de asociación, libertad de culto, entre otras.

5. Los residentes o visitantes no tendrán que detenerse por más tiempo que el que razonablemente toma hacer las mencionadas averiguaciones.

6. Por último, nada impide que se expidan o utilicen marbetes, calcomanías o impresos que faciliten la identificación de los residentes o sus automóviles, *pero no se obstaculizará la entrada de éstos a su comunidad cuando opten por no utilizar tales identificaciones.*

En cuanto a la intrusión subjetiva, ésta se minimiza limitando el elemento de aprehensión o sorpresa que genera el bloqueo. Véanse: *Pueblo v. Yip Berríos,* supra; *Asoc. Ctrl. Acc. C. Maracaibo v. Cardona,* supra. Por consiguiente, el bloqueo debe ser claramente visible y la iluminación del área y el uso de avisos son sumamente importantes. La interferencia con el flujo normal del tránsito debe ser mínima y, además, la operación del punto controlado de acceso debe garantizar la seguridad de los que por allí transitan.

En *Asoc. Ctrl. Acc. C. Maracaibo v. Cardona,* supra, establecimos también que se debe notificar o advertir a todo visitante potencial de los requisitos que debe cumplir y la información que se le pedirá en la entrada. Se deben colocar letreros que avisen, a una distancia razonable de la entrada, que los visitantes tendrán que parar sus vehículos brevemente con el propósito de informar su nombre, destino o propósito. De esta manera, el visitante que no esté de acuerdo puede retroceder antes de detenerse frente a la persona encargada de controlar el acceso, limitando así la intrusión subjetiva con la intimidad. Señala-

mos, además, que en ningún momento se puede detener a un residente así identificado o reconocido, en ausencia de sospecha centrada o motivos fundados, porque éste no tiene la libertad de retroceder: *es el acceso a su residencia el que se encuentra controlado.* Estas guías delimitan el máximo de interferencia con la intimidad individual permisible cuando se detienen vehículos de motor con motivo del control de acceso de una zona residencial.([9]) En *Pueblo v. Yip Berríos,* supra, reconocimos la necesidad de que las actuaciones de los agentes estatales respondieran a guías previamente establecidas para eliminar la posibilidad de arbitrariedad. Conforme a esto, resolvemos que los oficiales supervisores deben establecer guías y normas basadas en los criterios antes esbozados, que limiten la discreción de los agentes que laboran en bloqueos o en puntos de control de acceso. *Estas normas, a su vez, deben cumplirse estrictamente.* Esto imprime razonabilidad a la detención vehicular o peatonal en un punto de control de acceso de un área residencial por agentes del orden público, presumiendo, claro está, que esté presente un interés estatal válido. De haber un interés estatal válido y seguirse unas guías basadas en los criterios que adoptamos en *Pueblo v. Yip Berríos,* supra, y *Asoc. Ctrl. Acc. C. Maracaibo v. Cardona,* supra, la detención vehicular o peatonal por parte de agentes del Estado será permisible bajo nuestro esquema constitucional.

■ Reiteramos que la razonabilidad de cualquier bloqueo de carreteras, sea temporero —como en *Pueblo v.*

---

([9]) En cuanto a los peatones, señalamos específicamente que la detención para obtener información no constituye una detención que active la protección contra registros y allanamientos irrazonables, siempre que el agente del orden público no restrinja la libertad del individuo. *En otras palabras, la conversación debe ser voluntaria y espontánea, no puede haber ningún grado de restricción, no puede mediar coacción, intimidación y mucho menos fuerza o violencia por parte de los guardias. La razonabilidad depende de si una persona prudente y razonable, inocente de todo delito, pensaría que no está en libertad de marcharse. Pueblo en interés menor N.O.R.,* 136 D.P.R. 949, 956–959 (1994). Entiéndase por ello, que estos parámetros aplican en el caso de acceso peatonal al área residencial controlada, siempre que no restrinjan irrazonablemente la libertad del individuo transeúnte.

*Yip Berríos*, supra— o permanente —como los controles de acceso en este caso— se sujetará al análisis que hemos realizado. *Los agentes del orden público están obligados a observar las guías que desde Pueblo v. Yip Berríos, supra, dispusimos que eran imprescindibles para la validez de un bloqueo de carreteras y que hoy requerimos de igual forma, junto con los criterios adoptados en Asoc. Ctrl. Acc. C. Maracaibo v. Cardona*, supra, para la validez de operativos como los del caso de autos.([10])

## V

Los peticionarios también alegan que las actuaciones del Estado violaron el derecho al debido proceso de ley de los residentes de Jardines de Quintana.

El derecho constitucional al debido proceso de ley, en su modalidad procesal, está garantizado por el Art. II, Sec. 7 de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1. Dicha sección dispone: "Se reconoce como derecho fundamental del ser humano el derecho a la vida, a la libertad y al disfrute de la propiedad. ... Ninguna persona será privada de su libertad o propiedad sin debido proceso de ley...." L.P.R.A., Tomo 1, ed. 1999, pág. 280. En su vertiente procesal, la cláusula del debido proceso de ley "le impone al Estado la obligación de garantizar que la interferencia con los intereses de libertad y de propiedad del individuo se haga a través de un procedimiento que, en esencia, sea justo y equitativo". *P.A.C. v. E.L.A.*, 150 D.P.R. 359, 376 (2000). Reiteradamente hemos expresado que "el debido proceso de ley procesal no es un molde riguroso que se da en el abstracto, pues su natura-

---

([10]) Además, reiteramos la importante y consabida norma de que ante una impugnación judicial de este tipo de actuación, le corresponde al Estado probar su razonabilidad. Véanse: *Pueblo v. Bonilla*, 149 D.P.R. 318 (1999); *Pueblo v. Blase Vázquez*, 148 D.P.R. 618 (1988); *E.L.A. v. Coca Cola Bott. Co.*, 115 D.P.R. 197 (1984).

leza es eminentemente circunstancial y pragmática, no dogmática. Cada caso exige una evaluación concienzuda de las circunstancias envueltas". Íd. Esta protección constitucional se activa cuando está en juego un interés individual de libertad o propiedad. Una vez cumplida esta exigencia, procede que se determine el procedimiento a seguir. Íd. Al determinar las garantías a ofrecerse, "hay que analizar conjuntamente los intereses gubernamentales y los de la persona afectada". *Vélez Ramírez v. Romero Barceló*, 112 D.P.R. 716, 730 (1982).

## VI

De acuerdo con el marco doctrinario expuesto, concluimos que las actuaciones del Estado en Jardines de Quintana y en el Residencial Quintana son inconstitucionales, por interferir irrazonablemente con el derecho a la intimidad de los peticionarios y por no ofrecer las garantías mínimas que requiere el debido proceso de ley garantizado por nuestra Constitución. Veamos.

Las órdenes ejecutivas a las que hemos hecho referencia demuestran el propósito preventivo y remedial del Estado al implantar los llamados cierres de los residenciales públicos. *Se trata de un interés gubernamental válido*, enmarcado dentro de la obligación del Estado de velar por la seguridad de los ciudadanos y sus propiedades, que va más allá del interés general en combatir el crimen y detectar evidencia de conducta delictiva invalidado en *Indianapolis v. Edmond*, supra.

El interés gubernamental presente en este caso va dirigido a la *prevención*, en aras de "salvaguardar precisamente el sosiego, la paz, y la tranquilidad de la vida comunitaria, factores … que son parte del derecho a la dignidad e intimidad del ser humano, derechos de posición preferente en nuestro esquema constitucional". *Asoc. Ctrl. Acc.*

*C. Maracaibo v. Cardona,* supra, pág. 33. Sin embargo, según explicamos anteriormente, la validez de la intención estatal no conlleva necesariamente la validez constitucional de las medidas tomadas para implantarla.

En este caso, las actuaciones de los agentes del orden público exceden el máximo de intervención permitido por nuestra Constitución. Según prueba desfilada en el juicio y creída por el Tribunal de Primera Instancia, los agentes del orden público detienen tanto a los residentes como a los visitantes y no permiten la entrada sin antes requerir que se les muestren la licencia de conducir y la licencia del vehículo. Además, anotan las tablillas de los autos y las direcciones de los conductores. Cuando se trata de visitantes, anotan a dónde se dirigen, sin el consentimiento previo de los residentes. Estas detenciones se efectúan independientemente de la hora, de que se tenga sospecha centrada alguna o de la ausencia de consentimiento previo de los residentes.

Más importante aún, en este caso *el Estado no presentó prueba sobre las instrucciones dadas a los agentes con relación al acceso, registro y detención de los visitantes o de los residentes.* No hay prueba alguna de estándares o criterios neutrales que limiten las actuaciones de los agentes. Véase *Pueblo v. Yip Berríos,* supra, págs. 418–419.

*El Estado tampoco desfiló prueba sobre la visibilidad del bloqueo ni sobre los avisos de la detención y la información que se requeriría antes de permitir la entrada al residencial.* Por el contrario, según la prueba recibida, el visitante no tiene la alternativa de retroceder antes de detenerse frente al guardia y los agentes del orden público detienen de manera irrazonable a los peatones. Por todo ello, la intromisión subjetiva con la intimidad también es excesiva. Además, el Estado no presentó prueba pertinente en cuanto a la medida en que el programa de "rescate" y el subsiguiente control de acceso adelantan el interés público

en prevenir el crimen y salvaguardar el sosiego y la tranquilidad de la vida comunitaria.[11]

En fin, el objetivo de prevención y rehabilitación no justifica la intrusión en la intimidad individual que representan los bloqueos permanentes en el caso de autos. Éstos resultan equivalentes a la incautación de toda una comunidad,[12] debido a la inexistencia de guías previas y limitaciones a las actuaciones de los agentes del orden público. Tampoco se configura excepción alguna que justifique tal ausencia de normas, como las reconocidas en *Pueblo v. Yip Berríos*, supra, pág. 414, ante la falta de prueba que demuestre una verdadera situación de emergencia o de grave riesgo a la seguridad de las personas o sus propiedades.

Por todo lo anterior, resolvemos que erró el Tribunal de Apelaciones al validar las actuaciones del Estado en este caso. Éstas violan la protección constitucional contra registros y allanamientos irrazonables. El objetivo principal que motiva el bloqueo permanente de estas carreteras es válido, pero en el balance, no se justifica el grado de intrusión ejercido sobre la intimidad de los residentes demandantes.[13]

■ Por otro lado, en *Asoc. Ctrl. Acc. C. Maracaibo v. Cardona*, supra, págs. 29–30, señalamos:

> El derecho de la ciudadanía al uso y disfrute de los lugares públicos es básico dentro del esquema de valores de nuestro sistema democrático. Sin embargo, esto no significa que los ciudadanos tengan un derecho absoluto a su uso. El Estado, en

---

[11] Por el contrario, las determinaciones de hechos del Tribunal de Primera Instancia revelan un ánimo de aprehensión y temor en los residentes, atribuido a la presencia de la Policía y a los cambios efectuados a las vías públicas.

[12] El cierre de todas las vías de acceso a un residencial, obligando a sus residentes a entrar y salir por el bloqueo, constituye "más que un bloqueo de carreteras ... *una ocupación de una comunidad en particular*". (Énfasis suplido.) *Pueblo v. Yip Berríos*, supra, pág. 418.

[13] La actuación gubernamental violenta las Secs. 8 y 10 del Art. II de nuestra Constitución, *supra*, por lo que no es necesario atender los otros planteamientos de índole constitucional.

> el ejercicio de su poder *parens patriae*, puede válidamente re-
> glamentar el uso que se le dará a las calles siempre y cuando
> la reglamentación o legislación adoptada al respecto no inter-
> fiera de forma irrazonable con los derechos constitucionales de
> los individuos.
>
> En este contexto, el derecho a la libertad de movimiento o a
> discurrir libremente por las vías públicas ha sido reconocido
> como un derecho con valor propio, y no solamente como uno
> necesario para el ejercicio de otros garantizados
> constitucionalmente. Sin embargo, tampoco es absoluto. El
> Estado puede reglamentar su ejercicio dentro de los paráme-
> tros de nuestro ordenamiento constitucional. (Citas omitidas.)

No hay duda, pues, de que los residentes de Jardines de Quintana tienen, además del derecho a disfrutar de su propiedad, un derecho libertario de transitar libremente por las vías públicas. Esta privación de libertad redunda, a su vez, en el menoscabo del disfrute de su propiedad.

Según indicamos en un principio, la Ley Núm. 21, *supra*, no aplica al caso de autos. El cierre de las comunidades Jardines de Quintana y Residencial Quintana que llevó a cabo el Estado como parte del operativo para controlar la criminalidad en los residenciales públicos de alta incidencia criminal no está regulado por ley.[14] También resolvimos que si bien no podemos catalogar la situación que originó el operativo como una "emergencia", debemos proteger y avalar la actuación del Estado como un ejercicio válido del poder de razón de Estado. Ello, sin embargo, no justifica que el Estado actúe de manera arbitraria, en violación al derecho al debido proceso de ley de los residentes en el proceso de cierre de su comunidad.

El cierre de estas comunidades era parte de un plan estructurado que consistió de dos fases. En primer lugar, la Policía y la Guardia Nacional ocuparon las comunidades objeto del operativo y establecieron un cierre provisional. En una segunda fase llevaron a cabo el cierre permanente, tras construir estructuras de control de acceso y cerrar

---

[14] Según el foro de instancia, la parte demandada "no aportó evidencia alguna indicativa de la existencia de actividad delictiva en Jardines de Quintana".

ciertas vías de acceso permanentemente. En el caso de autos, transcurrió más de un año desde la ocupación y el cierre provisional hasta que se estructuró el cierre de manera permanente. Durante ese período, según las determinaciones de hechos del foro de instancia, el Estado "no notificó a los demandantes ni consultó a éstos con anterioridad al establecimiento del control de acceso .... Tampoco se convocó a la ciudadanía afectada por el cierre para conocer sus comentarios orales o escritos en audiencias públicas".

Por todo lo expuesto, no podemos reconocerle a los residentes de una comunidad objeto de un cierre como el de autos el derecho a que se les permita utilizar determinada vía de acceso a su propiedad. Sin embargo, en este caso hubo un largo período de transición antes de establecerse el cierre permanente. Resolvemos que, en esas circunstancias, debido a la naturaleza de los intereses implicados y a la necesidad del Estado de actuar de manera inmediata, resulta garantía suficiente conceder ciertos derechos mínimos en una etapa posterior a la ocupación inicial y al cierre provisional. En esa etapa, el Estado deberá auscultar las necesidades de los residentes y tomar en consideración sus inquietudes al estructurar finalmente el cierre permanente.

Estas exigencias encuentran apoyo en la política pública establecida en la Ley Orgánica de la Administración de la Vivienda Pública de Puerto Rico, Ley Núm. 66 de 17 de agosto de 1989 (17 L.P.R.A. sec. 1001 *et seq.*). El Art. 8 de esta ley, 17 L.P.R.A. sec. 1007, regula los programas de construcción, mejoras y reparación de residenciales públicos, y dispone:

... La Administración tendrá la obligación de establecer, mantener y poner en ejecución los programas que sean necesarios para el mantenimiento, limpieza, ornato de los residenciales públicos y para llevar a cabo las reparaciones ordinarias y extraordinarias, mejoras y obras de modernización de la planta física de los residenciales públicos. El Administrador podrá contratar con los municipios la realización de tales ser-

vicios y obras, siempre y cuando éstos tengan la capacidad para llevarlos a cabo. *Asimismo, deberá promover la participación de los residentes en estos programas para fortalecer el sentido de pertenencia a su comunidad y el fortalecimiento de las familias.* (Énfasis suplido.)

En el caso de autos, ambas comunidades estaban bajo la jurisdicción de la Administración de la Vivienda Pública.[15] El cierre permanente debió cumplir, en la medida en que fuera posible según los objetivos del Estado, la política pública imperante en la legislación vigente. Debemos recordar que "[l]as diferentes instituciones del Estado, la organización social y las expresiones oficiales de las instituciones gubernamentales, forman un todo integral que debe visualizarse como una entidad y no como partes separadas de una desorganización institucionalizada del azar". R.E. Bernier y J.A. Cuevas Segarra, *Aprobación e interpretación de las leyes en Puerto Rico*, 2da ed., San Juan, Pubs. J.T.S., 1987, pág. 483.

En *Com. Pro Perm. Bda. Morales v. Alcalde*, 158 D.P.R. 194 (2002), resolvimos que el procedimiento establecido por la Ley de Municipios Autónomos del Estado Libre Asociado de Puerto Rico para el cierre de calles no aplicaba a un cierre temporero mediante una orden ejecutiva del alcalde. Señalamos que

[e]s evidente que un cierre permanente de una vía municipal tiene consecuencias y efectos de mucho mayor alcance que un mero cierre provisional para fines temporeros, como es el caso de autos. Por ello se justifica que para aquél la ley re-

---

[15] En 1968 la extinta Corporación de Renovación Urbana y Vivienda de Puerto Rico (C.R.U.V.) adquirió el residencial Jardines de Quintana. Con la aprobación de la Ley Núm. 134 de 13 de diciembre de 1994, se traspasó a favor de la Administración de la Vivienda Pública "todo residencial público que forme parte del inventario de propiedades de la extinta CRUV. La Administración de Vivienda Pública continuará manejando los programas relacionados a estas propiedades según facultades conferidas en la Ley Núm. 66 de 17 de agosto de 1989". 1994 (Parte 2) Leyes de Puerto Rico 1246, 1251. Según las determinaciones de hechos del foro de instancia, en la actualidad la Administración de la Vivienda Pública es la propietaria de las áreas comunes de la comunidad Jardines de Quintana.

quiera seguir un procedimiento elaborado como el que establece la referida sección. Íd., págs. 200–201.

 Al controlar accesos y cerrar vías de manera permanente, el Estado interfiere con derechos libertarios protegidos por nuestra Constitución. Sin embargo, por razón de los intereses apremiantes implicados, sólo se deben conceder aquellas garantías que resulten viables para el Estado, según las circunstancias particulares. En el caso de autos los residentes de Jardines de Quintana demostraron ante el Tribunal de Primera Instancia razones concretas para solicitar el acceso directo a la calle Francia. El Estado no rebatió la prueba presentada ni demostró justificación alguna para no conceder dicho acceso. El expediente está huérfano de prueba por parte del Estado que nos lleve a denegar la solicitud de los residentes de Jardines de Quintana. Entendemos que erró el foro apelativo intermedio al revocar en su totalidad la sentencia del Tribunal de Primera Instancia y ordenamos que se reestructure el sistema de control de acceso de manera que se conceda acceso peatonal y vehicular a la calle Francia a través de la calle Irlanda Oeste.

## VII

Como cuarto señalamiento de error, los peticionarios alegan que el Tribunal de Apelaciones se equivocó al resolver que el Estado es inmune a reclamaciones de daños y perjuicios al amparo de la Ley de Reclamaciones y Demandas contra el Estado, Ley Núm. 104 de 29 de junio de 1955, según enmendada, 32 L.P.R.A. sec. 3077 *et seq.*, y al revocar por esta razón la indemnización en daños concedida por el foro de instancia. Hemos leído y analizado con detenimiento la transcripción estipulada de la prueba oral vertida en la vista ante el foro de instancia y concluimos que los peticionarios no demostraron con hechos concretos los

daños alegadamente sufridos. En vista de ello, resulta innecesario discutir este último planteamiento.

## VIII

Por los fundamentos antes expuestos, revocamos la sentencia del Tribunal de Apelaciones y declaramos inconstitucionales las actuaciones de los funcionarios públicos aquí impugnadas. Ya habíamos resuelto que el Estado debe establecer guías específicas para regir la conducta policial al detener vehículos de motor en un residencial público.[16] En este caso, el Estado no demostró que cumplió con este mandato. Por ello, le ordenamos adoptar, en el término de seis meses, rigurosas guías limitativas de las actuaciones de los agentes del orden público en el sistema de control de acceso implantado en Jardines de Quintana y en el Residencial Quintana al amparo de las órdenes ejecutivas antes mencionadas, conforme a lo que hemos explicado en esta opinión. En ese plazo, el Estado deberá tomar las medidas necesarias para dar acceso a los residentes de Jardines de Quintana a la calle Francia a través de la calle Irlanda Oeste. En cuanto a la remoción de la verja de cemento que alegadamente dividía el complejo de viviendas Jardines de Quintana del Residencial Quintana, no estamos en posición de proveer remedio alguno. Según las determinaciones del Tribunal de Primera Instancia, la verja tuvo que ser destruida para construir el segundo puesto de control de acceso (control 2). Los peticionarios no demostraron mayores perjuicios por la ubicación de esta estructura de control de acceso. Por el contrario, esta era la única vía disponible para los residentes sin tarjeta de identificación.

*Se dictará sentencia de conformidad.*

---

[16] *Pueblo v. Yip Berríos*, supra.

El Juez Asociado Señor Rivera Pérez disintió sin opinión escrita. El Juez Asociado Señor Rebollo López no interviene.