EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| El Pueblo de Puerto Rico<br><br>Peticionario<br><br>v.<br><br>Ángel Figueroa Jaramillo<br><br>Recurrido | Certiorari<br><br>2007 TSPR 83<br><br>170 DPR \_\_\_\_ |

Número del Caso: CC-2006-453

Fecha: 4 de mayo de 2007

Tribunal de Apelaciones:

> Región Judicial de Mayagüez

Juez Ponente:

> Hon. Roberto L. Córdova Arone

Oficina del Procurador General:

> Lcda. Amir Cristina Nieves Villegas
> Procuradora General Auxiliar

Abogado de la Parte Recurrida:

> Lcdo. Ángel M. Rivera Rivera

Materia: Agresión Agravada

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

      Peticionario

         v.                   CC-2006-453

Ángel Figueroa Jaramillo

      Recurrido

SENTENCIA

San Juan, Puerto Rico, a 4 de mayo de 2007.

Nos corresponde determinar si está eximido de responsabilidad penal un líder sindical que, en ocasión de un piquete obrero y bajo el argumento de que actuó en "defensa del espacio de protesta y su efectividad", empujó fuertemente a un oficial de seguridad del patrono que intentaba salir de la localidad gubernamental objeto del piquete --haciéndose paso, pacíficamente, a través de éste--, lo que ocasionó que el perjudicado impactara una verja, cayera al suelo y sufriera laceraciones en uno de sus brazos. El Tribunal de Apelaciones revocó la sentencia que dictó el Tribunal de Primera Instancia que lo había declarado culpable del delito de agresión

El Procurador General recurre ante nos de dicha determinación. Revocamos, veamos los hechos que originan el presente recurso.

I

El 14 de marzo de 2005, el Tribunal de Primera Instancia, Sala Superior de Mayagüez, dictó sentencia condenatoria contra el señor Ángel Figueroa Jaramillo, en adelante señor Figueroa Jaramillo, Vicepresidente de la Unión de Trabajadores de la Industria Eléctrica y Riego, en lo sucesivo UTIER, por haber cometido el delito tipificado como agresión, en su modalidad simple, en la persona del señor Gilberto H. Martínez López, en adelante señor Martínez López o el perjudicado, Oficial de Seguridad de la Autoridad de Energía Eléctrica. Los hechos juzgados se remontan al 25 de mayo de 2004, día en que afiliados de la UTIER, liderados por el señor Figueroa Jaramillo, realizaron un piquete en las instalaciones de la Autoridad de Energía Eléctrica (AEE), conocida como "la técnica", en la ciudad de Mayagüez.

Luego de apreciar la prueba testifical de cargo y el testimonio del propio acusado, el Tribunal de Primera Instancia concluyó que, ese día, el señor Figueroa Jaramillo empleó fuerza y violencia contra el señor Martínez López, con el propósito de causarle daño, y así impedir que éste saliera por el portón peatonal de la instalación gubernamental. La fuerza o violencia ejercida contra el perjudicado consistió y resultó en un fuerte empujón contra una verja de tubos de

acero, su inmediata caída al suelo y laceraciones en su antebrazo derecho. Al condenar al señor Figueroa Jaramillo a la pena de $150 de multa, el juez sentenciador expresó que éste tenía un derecho constitucional a realizar piquetes contra la AEE, pero no podía ejercerlo "en detrimento de otras libertades constitucionales, como la dignidad del ser humano", en este caso, la del perjudicado señor Martínez López.[1]

Denegada una moción de reconsideración, el señor Figueroa Jaramillo presentó un recurso de apelación ante el Tribunal de Apelaciones. Éste, mediante sentencia emitida el 15 de marzo de 2006, revocó la sentencia condenatoria dictada por el Tribunal de Primera Instancia y absolvió al señor Figueroa Jaramillo. Apoyó su dictamen revocatorio en tres (3) fundamentos, a saber: (1) encontró contradicciones o inconsistencias en la prueba oral de cargo, (2) no se probó el delito más allá de duda razonable y (3) concluyó que el Ministerio Público no probó el estado mental de intención de causar daño, elemento del delito de agresión, toda vez que el **"empujón fue a raíz del intento del [perjudicado] de atravesar entre los huelguistas"** (énfasis nuestro).[2] El Procurador General presentó ante el Tribunal de Apelaciones

---

[1] Apéndice de la Petición de *Certiorari*, pág. 207.

[2] Íd., pág. 32. Cabe destacar que el juez Jorge Lucas Escribano Medina emitió un Voto Disidente. Apéndice de la Petición de *Certiorari*, pág. 34.

una moción de reconsideración, la cual fue declarada "No Ha Lugar".[3]

Inconforme, el 10 de mayo de 2006, el Procurador General recurrió ante nosotros mediante Petición de *Certiorari*, señalando los errores siguientes:

> **1. Erró el Tribunal de Apelaciones al revocar la sentencia de culpabilidad – válida, fundamentada y conforme a derecho – que fue dictada contra el recurrido por cometer el delito de agresión, a base del razonamiento erróneo y sin base alguna en derecho de dicho foro, en cuanto a que no incurre en responsabilidad penal quien defiende mediante la agresión la realización de una actividad sindical en la que se está coartando en forma ilegal el derecho al libre tránsito de otras personas, cuando un tercero intenta ejercer su libertad de movimiento de manera pacífica en medio de la misma.**

> **2. Erró el Tribunal de Apelaciones al revocar la convicción del recurrido, la cual era válida, fundamentada y conforme a derecho, aún cuando la misma fue sustentada con evidencia satisfactoria y suficiente en derecho que probó más allá de duda razonable la configuración de todos los elementos del delito de agresión cometido por el recurrido, Ángel Figueroa Jaramillo, contra el Sr. Gilberto H. Martínez López.**

> **3. Erró el Tribunal de Apelaciones al revocar la sentencia de culpabilidad – válida, fundamentada y conforme a derecho – que fue dictada en este caso, sustituyendo el razonable, sensato y correcto criterio del juez de instancia, quien vio y oyó declarar a los testigos. Incidió en así actuar sin hacer señalamiento alguno en cuanto a la existencia de error manifiesto, pasión, prejuicio o parcialidad en la apreciación de la prueba oral desfilada. Erró el Tribunal recurrido al determinar que se imponía la absolución del acusado por razón de que las declaraciones de los (2) testigos del Ministerio Público no eran absolutamente idénticas en cuanto a su apreciación de aspectos insustanciales de los**

---

[3] En la resolución emitida a esos efectos por el Tribunal de Apelaciones se hizo constar que el juez Escribano Medina reconsideraría. Apéndice de la Petición de *Certiorari*, pág. 3.

**hechos, los cuales no estaban relacionados en modo alguno con los elementos esenciales del delito imputado al acusado.**

Examinada la Petición de *Certiorari* del Procurador General, el 30 de junio de 2006, emitimos una resolución mediante la cual concedimos al señor Figueroa Jaramillo un término de veinte (20) días para mostrar causa por la cual no debíamos expedir el auto solicitado y revocar la sentencia dictada por el Tribunal de Apelaciones.

El señor Figueroa Jaramillo ha comparecido, por lo que nos encontramos en posición de resolver.

Expedimos el auto y revocamos al Tribunal de Apelaciones. Reinstalamos el fallo de culpabilidad dictado por el Tribunal de Primera Instancia.

Lo acordó el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Rivera Pérez emite una Opinión de Conformidad a la que se unen el Juez Presidente señor Hernández Denton y el Juez Asociado señor Rebollo López. La Jueza Asociada señora Rodríguez Rodríguez emite una Opinión de Conformidad a la que se une la Jueza Asociada señora Fiol Matta. El Juez Asociado señor Fuster Berlingeri concurre sin opinión escrita.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

      Peticionario

        v.                  CC-2006-453

Ángel Figueroa Jaramillo

      Recurrido

Opinión de Conformidad emitida por el Juez Asociado señor Rivera Pérez a la cual se une el Juez Presidente señor Hernández Denton y el Juez Asociado señor Rebollo López.

San Juan, Puerto Rico, a 4 de mayo de 2007.

La sección 1 de la Carta de Derechos de la Constitución de Puerto Rico consagra el principio de la inviolabilidad de la dignidad del ser humano.[4] Por su parte, la sección 8 de dicha Carta dispone que toda persona tiene derecho a estar protegida contra ataques abusivos a su honra, a su reputación y a su vida privada o familiar. Hemos resuelto y reiterado en múltiples ocasiones que la referida sección 8 opera *ex proprio vigore*, por lo que puede ser invocada frente a personas privadas, sin

---

[4] Art. II, Sec. 1, Const. E.L.A., L.P.R.A., Tomo 1.

necesidad de ley que la complemente.[5]  El Informe de la

Comisión de la Carta de Derechos a la Convención Constituyente

subrayó la importancia y amplitud de ambas secciones al

afirmar:

> La protección contra ataques a la honra,
> reputación y vida privada constituye también un
> principio que complementa el concepto de la
> dignidad humana mantenido en esta Constitución.
> **Se trata de la inviolabilidad personal en su
> forma más completa y amplia**. **El honor y la
> intimidad son valores del individuo que merecen
> protección cabal,** no sólo **frente a atentados
> provenientes de otros particulares,** sino también
> contra ingerencias abusivas de las autoridades
> (énfasis nuestro).[6]

Ahora bien, aún cuando la protección a la honra,

intimidad e integridad personal es un derecho constitucional

consubstancial al inviolable principio de la dignidad del ser

humano, no es absoluto.  La propia Constitución lo

condiciona, pues lo que ésta proscribe es la intromisión

**abusiva** del Estado y otros particulares con la honra, la

reputación y la vida privada y familiar del ciudadano.[7]

Hemos expresado que lo más preciado que tiene un ser

humano es su dignidad, integridad personal e intimidad.[8]

Entonces, no cabe duda de que las personas albergan con

respecto a su propio cuerpo la más alta expectativa de

---

[5] Segarra v. Royal Bank, 145 D.P.R. 178, 190 (1998); Arroyo
v. Rattan Specialties, Inc., 117 D.P.R. 35, 56 (1986);
Quiñones v. ELA, 90 D.P.R. 812, 816 (1964); González v.
Ramírez Cuerda, 88 D.P.R. 125, 133 (1963).

[6] Diario de Sesiones, *supra*, pág. 2566.

[7] Pueblo v. Falú, 116 D.P.R. 828, 837 (1986).

[8] Arroyo v. Rattan Specialties, Inc., *supra*, pág. 56.

intimidad.[9] Sólo la persona, el ciudadano en sí mismo, tiene un derecho legítimo de acceso a su propio cuerpo.[10]

Citando al profesor Ernesto L. Chiesa, hemos señalado que el derecho a la protección de la intimidad e integridad personal es uno "fundamentalmente unitario".[11] Esto, porque "cubre tanto la protección contra registros e incautaciones en el sentido material (registrar lugares e incautar cosas) como la intrusión más abstracta".[12] Intervenir con las manos y directamente con el cuerpo de otro semejante no es una intrusión abstracta sino tajante, por lo que tal intrusión, inequívocamente, está cubierta por la protección constitucional de la intimidad, honra e integridad personal.

Por otro lado, en Asoc. Pro Control de Acceso Calle Maracaibo, Inc. v. Cardona, reconocimos el derecho a libre acceso y movimiento que todo ciudadano tiene sobre las vías públicas del país. Así nos pronunciamos al respecto:

> **...el derecho a la libertad de movimiento o a discurrir libremente por las vías públicas ha sido reconocido como un derecho con valor propio, y no solamente como uno necesario para el ejercicio de otros garantizados constitucionalmente.** Sin embargo, tampoco es absoluto. El Estado puede reglamentar su

---

[9] Pueblo v. Bonilla, 149 D.P.R. 318, 331 (1999).

[10] Íd. Hemos resuelto que el Estado únicamente puede intervenir con el cuerpo de un ciudadano cuando la intervención es razonable, desde el crisol de la cláusula constitucional que protege a las personas contra registros y allanamientos irrazonables, Art. II, Sec. 10, Const. E.L.A., L.P.R.A., Tomo 1; Pueblo v. Bonilla, supra, pág. 333.

[11] Pueblo v. Colón Rafucci, 139 D.P.R. 959, 963 (1996).

[12] Íd.

ejercicio dentro de los parámetros de nuestro ordenamiento constitucional (énfasis añadido).[13]

En igual sentido, en <u>Ortiz v. D.T.O.P.</u>[14], expresamos que la protección de la libertad de movimiento es de rango constitucional, dimanante de la sección 10 de la Carta de Derechos de la Constitución de Puerto Rico.[15] Específicamente indicamos:

> ...no es necesario hacer referencia a las exigencias constitucionales relativas a **detenciones personales que surgen al amparo de la Sección 10 del Art. II de nuestra Ley Fundamental, que protegen a la persona contra cualquier clase de intervención con la libertad de movimiento** <u>o con el derecho a la intimidad</u>...(énfasis suplido)[16]

Dicho de otra forma, todo ciudadano tiene, primero, la facultad natural, inherente a su derecho inalienable de libertad personal, de transitar y discurrir por las calles y aceras del país, sin sujeciones o limitaciones del Gobierno o de otros particulares. De hecho, no es de extrañar que ello sea así, pues ésta ha sido la práctica en Puerto Rico desde tiempos inmemoriales. En segundo término, todo ciudadano tiene el derecho constitucional a moverse con libertad por nuestras aceras y vías públicas porque de ello depende el ejercicio del catálogo de derechos que le confiere la Carta de Derechos de nuestra Constitución, entre ellos, precisamente,

---

[13] 144 D.P.R. 1, 30 (1997). Dichos pronunciamientos fueron reafirmados literal y recientemente en <u>Nieves v. AM Contractors, Inc.</u>, 2005 T.S.P.R. 181, 2005 J.T.S. 186, 166 D.P.R. __ (2005).

[14] 2005 T.S.P.R. 35, 2005 J.T.S. 40, 164 D.P.R. __ (2005).

[15] Art. II, Sec. 10, Const. E.L.A., L.P.R.A., Tomo 1.

[16] <u>Ortiz v. D.T.O.P.</u>, *supra*.

el derecho a la libertad de expresión[17], de reunión[18], de pedirle al gobierno la reparación de agravios[19], de asociación[20], a no sufrir detenciones o arrestos sin causa probable[21], a irse a la huelga, establecer piquetes y realizar otras actividades concertadas, a fin de organizarse y negociar colectivamente con sus patronos.[22]

Claro está, el derecho descrito no es absoluto. Puede ser regulado en interés del bienestar general, en función de mantener el orden, la paz pública y la sana convivencia social.[23]

---

[17] Art. II, Sec. 4, Const. E.L.A., L.P.R.A., Tomo 1.

[18] Íd.

[19] Íd.

[20] Art. II, Sec. 6, Const. E.L.A., L.P.R.A., Tomo 1.

[21] Art. II, Sec. 10, Const. E.L.A., *supra*.

[22] Art. II, Sec. 18, Const. E.L.A., L.P.R.A., Tomo 1.

[23] El Estado puede reglamentar razonablemente el tiempo, lugar y modo en que los piquetes se desarrollan, cuando ello es necesario en protección de intereses gubernamentales significativos. Police Department of Chicago v. Mosley, 408 U.S. 92, 98 (1972); Shuttlesworth v. Birmingham, 394 U.S. 147 (1969); Amalgamated Food Employees v. Logan Valley Plaza, 391 U.S. 308, 320-321 (1968); Adderley v. Florida, 385 U.S. 39, 46-48 (1966); Cox v. Louisiana, 379 U.S. 536, 554-555 (1965); Poulos v. New Hampshire, 345 U.S. 395 (1953); Cox v. New Hampshire, 312 U.S. 569, 575-576 (1941). Así, por ejemplo, cuando distintos grupos de manifestantes hacen demandas conflictivas para marchar, manifestarse o "piquetear" en un mismo lugar, el Estado puede tomar medidas cautelares, tales como establecer perímetros o, incluso, escoger entre los potenciales usos y usuarios del referido derecho constitucional, garantizando su ejercicio, pero, a la vez, protegiendo la seguridad de todos los manifestantes y el orden público en general. Police Department of Chicago v. Mosley, 408 U.S. 92, 98 (1972). De esta forma, se ha resuelto que cuando dos (2) manifestaciones no pueden discurrir simultáneamente por la misma carretera, el Gobierno puede decidir permitir sólo una. Grayned v. City of Rockford, 408

De ordinario, las demostraciones **pacíficas** en lugares públicos gozan de protección constitucional bajo la Primera Enmienda de la Constitución federal[24] y bajo la sección 4 de la Carta de Derechos de la Constitución de Puerto Rico.[25] Más aún, si se tratare de un piquete obrero o de otro tipo de actividad obrera concertada, dentro del contexto del derecho constitucional a organizarse y a negociar colectivamente con sus patronos, tales demostraciones están expresamente protegidas por la sección 18 de la Carta de Derechos de nuestra Constitución.[26] El problema surge cuando la demostración es o se torna **violenta**.

El ejercicio de violencia no goza de protección bajo el manto del derecho constitucional a la libertad de expresión.[27] La violencia u otros tipos de conductas potencialmente expresivas, pero dañosas, independientemente de su posible impacto comunicativo, constituyen prácticas desprovistas de

---

U.S. 104, 115 (1972); Cox v. New Hampshire, 312 U.S. 569, 576 (1941).

En igual sentido, se ha determinado que cuando en una carretera principal se proyecta o se realiza una demostración en una hora crítica de tránsito, pudiera prohibirse para evitar o corregir un efecto intolerable en el flujo vehicular. Grayned v. City of Rockford, *supra*; Cox v. Louisiana, 379 U.S. 536, 554 (1965). Asimismo, es norma jurisprudencial que cuando bocinas de sonido amplificado asaltan una comunidad o sector ciudadano, el Estado puede ordenar bajar su volumen. Grayned v. City of Rockford, *supra*; Kovacs v. Cooper, 336 U.S. 77 (1949).

[24] Police Department of Chicago v. Mosley, *supra*, págs. 95-96; Grained v. City of Rockford, *supra*.

[25] Art. II, Sec. 4, Const. E.L.A., L.P.R.A., Tomo 1.

[26] Art. II, Sec. 18, Const. E.L.A., L.P.R.A., Tomo 1.

[27] National Assoc. for the Advancement of Colored People v. Claiborne Hardware Co., 458 U.S. 886, 916 (1982).

protección constitucional.[28]   Esa visión que afirma que, siempre que se esté intentando comunicar una idea, es ilimitada la variedad de conducta que puede ser etiquetada de "expresión", ha sido rechazada.[29] **Por ello, por más que estiremos nuestra imaginación, una agresión física no representa conducta expresiva protegida por la Primera Enmienda de la Constitución federal.**[30]   En ese sentido, el tratadista Thomas I. Emerson, en su obra <u>The System of Freedom of Expression</u> nos indica:

> [p]revention of criminal acts by persons pretending to engage in expression presents a clear case for direct control of the criminal [by the Government], not the suppression or restriction of expression.[31]

Indiscutiblemente, el Estado puede lidiar con situaciones de violencia surgidas en disputas obreras. Ahora bien, como norma general, su radio de acción interventor está limitado a establecer medidas o proveer remedios que atiendan las consecuencias directas de la conducta violenta.[32] Es así porque su motivación no puede ser suprimir las libertades constitucionales de palabra, de reunión, de asociación y de petición; tampoco socavar los derechos constitucionales de

---

[28] <u>Roberts v. United States Jaycees</u>, 468 U.S. 609, 628 (1984).

[29] <u>United States v. O´Brien</u>, 391 U.S. 367, 376 (1968).

[30] <u>Wisconsin v. Mitchell</u>, 508 U.S. 476, 484 (1993).

[31] T.I. Emerson, <u>The System of Freedom of Expression</u>, New York, Ed. Vintage Books, a Division of Random House, 1970, pág. 353.

[32] <u>United Mine Workers of América v. Gibbs</u>, 383 U.S. 715, 729 (1966).

hacer la huelga, piquetes y otras actividades sindicales concertadas.

**No obstante, los actos o conductas expresivas individuales o concertadas que presenten violencia, desorden significativo o la invasión de los derechos de otros ciudadanos, aún dentro del contexto de una disputa obrero patronal, pueden ser restringidos por la autoridad gubernamental.** El mantenimiento del orden y la paz pública, de la sana convivencia social y del bienestar general son valores que merecen protección, por encima de cualquier consideración de carácter individual o de un grupo particular. Afirma Emerson:

> [m]aintenance of public peace, without destroying the mobility of the society, is a primary requisite of any social order. For the most part, this condition must be achieved through laws and institutions that control action.[33]

En varias ocasiones nos hemos enfrentado a situaciones en las que han chocado los derechos constitucionales a la libertad de expresión, a la huelga y a piquetear de unos con otros derechos que nuestro ordenamiento jurídico confiere a otros ciudadanos. A continuación, algunos de nuestros pronunciamientos al respecto.

En El Imparcial, Inc. v. Brotherhood, etc.[34], indicamos que aún dentro de la anormalidad que produce un estado de huelga, **los empleados del patrono que no participan de la misma tienen derecho a estar protegidos contra toda conducta de los manifestantes que envuelva ataques personales, amenazas**

---

[33] T.I. Emerson, *op cit*, pág. 311.

**e intimidación**. Expresamos, además, que **los empleados no huelguistas que desean trabajar tienen derecho a hacerlo, sin daño a su propiedad física ni obstáculos a su libre acceso a las instalaciones del patrono, libres de intimidación, de insultos y del estado de violencia que pudiera crearse en la disputa obrera**.[35]

De otro lado, en <u>E.L.A. v. Hermandad de Empleados</u>, señalamos lo siguiente:

> **[S]i la autoridad del gobierno al respecto fuese tan insignificante que cualquier persona con una queja que expresar tuviese el vasto poder de hacer lo que quisiere, donde y cuando lo deseare, desaparecerían nuestras costumbres y hábitos sociales, políticos, económicos, éticos y religiosos de conducta**, convirtiéndose tan solo en reliquias de un pasado perdido pero no olvidado (énfasis suplido).[36]

En ese mismo caso, específicamente en la Opinión Concurrente del Juez Asociado Señor Rigau, a la cual se unió el Juez Asociado Señor Díaz Cruz, se expresó:

> [n]o creemos que para el hombre civilizado **la libertad de conciencia es menos importante que la libertad física**.
> ........
> En estos casos es preciso **trazar una línea entre el ejercicio lícito y el ejercicio ilícito** de esos derechos [de expresión, reunión y petición].
> ........
> [...] **un acoso personal** que **no está protegido por la Constitución**. Se torna en una alteración injustificada de la paz...(énfasis añadido).[37]

---

[34] 82 D.P.R. 164, 194-195 (1961).

[35] Íd.

[36] <u>E.L.A. v. Hermandad de Empleados</u>, 104 D.P.R. 436, 444 (1975).

[37] Íd., págs. 449- 451.

Finalmente, en <u>A.A.A. v. Unión de Empleados A.A.A.,</u> expusimos lo siguiente:

> **La violencia** o el sabotaje **como arma de coacción** directa o indirecta de cualquier sector **en una disputa obrero patronal no tiene cabida en nuestra sociedad por confligir con el principio básico de convivencia social pacífica que presupone el ejercicio de cualquier derecho bajo nuestra Constitución.** Cuando la naturaleza, magnitud e intensidad del conflicto cobra las dimensiones que distinguió el caso de autos, **los tribunales no pueden** hacer abstracción de tal realidad y **adoptar pronunciamientos y posiciones que destruyan las aspiraciones legítimas de un pueblo que adoptó como norma de excelencia el reconocer y proveer en todo conflicto un equilibrio moderador y justiciero entre los derechos legítimos y razonables de cualesquiera de sus miembros, ya sea actuando en su carácter individual o concertadamente y los justos reclamos de seguridad, paz y salud del propio pueblo** que reconoce y protege los derechos de sus integrantes (énfasis nuestro).[38]

Con este trasfondo doctrinal en mente, procedemos a resolver los puntos de derecho contenidos en el primer señalamiento de error del Procurador General.

En la discusión del referido error, el Procurador General señala que durante todo el proceso criminal seguido contra el señor Figueroa Jaramillo, éste adoptó, como argumento flotante de defensa, que los hechos de fuerza o violencia acaecidos el 25 de mayo de 2004, en la "técnica" de la AEE en Mayagüez, se justifican por razón de haberse suscitado en el contexto de una actividad sindical concertada, un piquete obrero. La propia argumentación en sala del abogado defensor del recurrido corrobora la aseveración del Procurador General:

> [e]h, vamos a comenzar por manifestarle al tribunal que todo este asunto eh, surge como

---

[38] 105 D.P.R. 437, 460 (1976).

> consecuencia de una actividad obrero-patronal, una actividad concertada donde hay una celebración de unos piquetes [sic] **donde tanto la unión como [la] gerencia están defendiendo sus respectivos espacios y dónde la unión está defendiendo no solamente la protesta a la cual tiene derecho constitucionalmente sino la efectividad de la misma. Porque de nada vale ejercer el derecho constitu... constitucional de una forma en [sic] no efectiva** (énfasis suplido).[39]

El Procurador General plantea que el referido argumento no tuvo éxito en el Tribunal de Primera Instancia, porque, contrario al mismo, el juez sentenciador expresó en sala, al momento de dictar su sentencia de culpabilidad contra el señor Figueroa Jaramillo, que el derecho constitucional a la huelga, a establecer piquetes y otras actividades sindicales concertadas no podía ser ejercido en detrimento de las libertades constitucionales de otras personas. Aduce que el Tribunal de Apelaciones erró al revocar dicha conclusión de derecho y absolver al señor Figueroa Jaramillo bajo el fundamento de que los hechos habían sucedido como consecuencia del intento del perjudicado de cruzar una línea de piquete establecida por miembros de la UTIER, dirigidos por el señor Figueroa Jaramillo. Evidentemente, como señala el Procurador General en su recurso, el razonamiento detrás del fundamento revocatorio del Tribunal de Apelaciones es que la violencia se justificó, porque el señor Martínez López **"se buscó el golpe"** al intentar salir de las instalaciones de la AEE objeto del piquete, contra la voluntad del señor Figueroa Jaramillo y demás manifestantes.

---

[39] Apéndice de la Petición de *Certiorari*, pág. 195.

Estamos en mejor posición para resolver las cuestiones de derecho planteadas por el Procurador General examinando brevemente la descripción de la protesta **que hiciera el propio señor Figueroa Jaramillo** al declarar en el juicio:

> **...la matrícula** [de la UTIER] **decidió paralizar la labor durante todo el día,** ahí entonces **nos distribuimos en** dos, en **los dos portones que habían allí** ubicados, **uno [peatonal] en "Church" y otro** en el portón **donde** se **entra y sale,** este **los vehículos de la Autoridad.**
> ........
> Pues, **en esa mañana, estuvimos** [en] los dos, [en] **los dos portones situados,** por lo menos yo estuve casi toda la mañana en el portón que transita [sic] los vehículos, allí estuvimos **haciendo nuestra manifestación...** (Énfasis nuestro)[40]

Continuó declarando que:

> **...ellos [el señor Martínez López** y sus acompañantes] **pretendieron salir por la línea de piquete,** por la actividad, que se había rea... que se estaba realizando allí [en el portón peatonal].
> ........
> **...tratando de almorzar...**(Énfasis suplido)[41]
> ........
> **<u>Entonces nos movilizamos hacia el portón</u>,** para así manifestar nuestra actividad <u>**indicándole**</u> que no, **<u>que no pueden salir de ahí</u>** (énfasis añadido).[42]

Del testimonio del señor Figueroa Jaramillo se desprende que los dos (2) portones de acceso a las facilidades de la AEE estaban bloqueados por los manifestantes en piquete. También, que el señor Figueroa Jaramillo y otros manifestantes le negaron el acceso por el portón peatonal de la AEE al señor Martínez López. Como argumentara su abogado defensor, el señor Figueroa Jaramillo y sus compañeros manifestantes

---

[40] Apéndice de la Petición de *Certiorari*, pág. 185.

[41] Apéndice de la Petición de *Certiorari*, pág. 186.

[42] Íd., págs. 186-187.

estaban defendiendo su **"espacio de protesta"** y la **"efectividad de la misma"**.

Entonces, nos preguntamos, **¿está eximido de responsabilidad penal el señor Figueroa Jaramillo, si en función de la defensa de ese "espacio de protesta" y su "efectividad", agredió a un empleado no huelguista de la AEE, para impedir su salida de la localidad gubernamental? ¿La defensa de ese "espacio de protesta" y su "efectividad", confiere el derecho a impedir mediante la fuerza y la violencia la entrada y salida de empleados no huelguistas u otros particulares a las instalaciones de la AEE?** Las respuestas a estas interrogantes son en la negativa.

El señor Figueroa Jaramillo y los empleados afiliados a la UTIER que le acompañaban disfrutaban, en el ejercicio de su manifestación, de toda una gama de derechos constitucionales: derecho a libertad de expresión, de reunión, de asociación, de solicitar al Gobierno, en este caso a la AEE, como patrono, la reparación de agravios. También, en su relación directa como empleados de la AEE, los derechos constitucionales a irse a la huelga, a piquetear y a llevar a cabo otras actividades concertadas.

Ahora bien, la huelga, el piquete y cualesquiera otras actividades sindicales concertadas, necesariamente tienen que ser **legales** para que estén revestidas de protección constitucional. Así lo condiciona expresamente la sección 18 de la Carta de Derechos de nuestra Constitución, *supra*, al leer que "los trabajadores... tendrán... el derecho a la huelga, a establecer piquetes y a llevar a cabo otras

actividades concertadas **legales"** (énfasis nuestro). Reiteramos que estos derechos no son ilimitados ni irrestrictos, pues el Estado puede regularlos razonablemente en términos de tiempo, lugar y modo en que se ejercen y desarrollan, en protección de valores o intereses significativos como el mantenimiento del orden, la paz pública, la sana convivencia social y el bienestar general.

Asimismo, hemos visto que el derecho constitucional a la libertad de expresión no se extiende al ejercicio de violencia, no importa el impacto comunicativo que ella pueda generar en el curso de un conflicto obrero patronal. La violencia no goza de protección constitucional y el Estado tiene, no sólo la facultad, sino el deber de intervenir con los que la practican para proveer remedios a sus consecuencias directas, incluyendo su procesamiento criminal. **En ese sentido, la agresión física no constituye conducta expresiva protegida. Aquel que desee llevar con ella algún mensaje, está sujeto a sufrir las consecuencias de una conducta desprovista de protección jurídica.** Aunque el Gobierno, como norma general, no puede intervenir con el mensaje, sí puede con el modo en que éste se expresa, cuando en vez de pacífico, se escoge uno violento o se torna violento.

No puede ser de otra manera. El principio de convivencia social pacífica tiene que seguir siendo nuestro norte y guía en el ejercicio democrático de nuestros derechos constitucionales y legales. No importa la magnitud de la ola de violencia que azota actualmente a nuestra sociedad, esta Curia continúa protegiendo y fomentando el ejercicio seguro,

pacífico y salubre de los derechos de sus integrantes. Tenemos el deber de resistir la violencia y de combatirla, no importa de qué circunstancias, de quién o de dónde provenga.

Debemos añadir que ni el derecho constitucional a la libertad de expresión ni el derecho constitucional a piquetear al patrono se extiende a intervenir ilegalmente con el cuerpo de ciudadanos que no participan de una actividad sindical concertada. **El ejercicio de estos derechos por parte de un líder obrero o empleado unionado no puede destruir la expectativa de intimidad que tiene un ciudadano, un empleado no unionado o un empleado unionado, pero no participante de la protesta sindical, con respecto a su cuerpo.** En este sentido, una agresión física representa una intrusión intolerable con el inviolable principio constitucional de la dignidad del ser humano y una afrenta al derecho constitucional a estar protegido contra ataques abusivos a la intimidad, honra e integridad personal del ciudadano.

Reafirmamos que sólo la persona, el ciudadano en sí mismo, tiene un derecho legítimo de acceso a su propio cuerpo. El ejercicio de la libertad de expresión y del derecho a piquetear no inmuniza conducta violatoria de las leyes. **La agresión física, independientemente de que ocurra dentro del contexto de una actividad sindical concertada, constituye conducta ilegal delictiva, penada bajo nuestro ordenamiento jurídico, a no ser que se ejerza en una legítima defensa propia o en la legítima defensa de un tercero.**

Por tanto, resolvemos que la defensa del "espacio de protesta" y su "efectividad" no constituye un eximente de

responsabilidad penal ni excusa la comisión del delito de agresión cuando, en ocasión de un piquete sindical, el agresor se vale de ella para intentar impedir que el perjudicado entre o salga de la localidad objeto del piquete.

Por otro lado, a lo largo de la historia de las relaciones obrero patronales de nuestro país, el ejercicio de la libertad de expresión y del derecho a la protesta, mediante una huelga, piquete u otro tipo de actividad obrera concertada, han representado mecanismos de presión comúnmente utilizados por los trabajadores para conquistar derechos y beneficios en la mesa de negociación colectiva y para hacerlos valer, una vez adquiridos mediante convenio colectivo u otro tipo de estipulación. Al hacer uso de estos mecanismos de presión, se busca atraer la atención pública y crearle al patrono una atmósfera inestable o intolerable que propicie que éste ceda a los reclamos de los trabajadores. Son mecanismos de presión de existencia constitucional, instrumentados por legislación federal y estatal de relaciones del trabajo.

Así, al establecer un piquete, ya sea como parte de un estado huelgario o como una mera actividad concertada dentro del curso de un proceso organizacional o de negociación colectiva, los empleados manifestantes tienen el legítimo derecho **de persuadir pacíficamente** a clientes, suplidores, visitantes y otros empleados del patrono a que no entren a la instalación patronal objeto del piquete. No albergamos dudas de que una concurrida, entusiasta y militante línea de piquete podría ser capaz de crear ese efecto disuasivo, redundando

ello en una mayor efectividad de la protesta, desde la perspectiva de los trabajadores.

Ahora bien, **una cosa es persuadir pacíficamente** a clientes, suplidores, visitantes y otros empleados del patrono a no entrar o salir de la localidad piqueteada, **y otra, imponer ese resultado mediante el uso de la violencia física o impidiendo el paso con intimidación o fuerza ilegal, coartando el derecho de los demás a la libertad de movimiento y acceso a aceras, calles y facilidades públicas.**

El derecho constitucional a la protesta de unos no puede ejercitarse en violación a los derechos naturales, constitucionales y legales de otros conciudadanos. **Tan legítimo es el derecho de unos a protestar como el derecho de otros semejantes a trabajar y a moverse libremente para hacer sus gestiones y quehaceres diarios por las vías y facilidades públicas del país.** El sentido común, modo de pensar y proceder que tenemos la generalidad de las personas, nos tiene que dirigir en el ejercicio civilizado de nuestros derechos, de manera que siempre podamos hacerlo dentro del marco de lo legal, y frenarnos cuando llegamos a la línea divisoria, a veces de tonalidad gris, que separa lo legal de lo ilegal.

Concluimos que la defensa del "espacio de protesta" y su "efectividad" de ninguna manera confería al señor Figueroa Jaramillo, ni a los empleados unionados que éste lideraba en el piquete, el derecho a bloquear e impedir, mediante la fuerza y la violencia, la salida de las instalaciones de la AEE al señor Martínez López, empleado no huelguista de la instrumentalidad gubernamental, hacia la vía pública. Erró el

Tribunal de Apelaciones al revocar la convicción del señor Figueroa Jaramillo bajo un fundamento justificativo de la violencia. Incidió ese foro al implicar que el intento del señor Martínez López de salir de las instalaciones de la AEE, contra la voluntad del señor Figueroa Jaramillo y demás manifestantes, justificó su agresión.

Por estar estrechamente relacionados, discutiremos conjuntamente los restantes señalamientos de error del Procurador General.

Según mencionáramos en la relación de hechos de este caso, el Tribunal de Apelaciones revocó la sentencia condenatoria por el delito de agresión dictada contra el señor Figueroa Jaramillo, por dos (2) fundamentos adicionales, a saber: (1) la existencia de contradicciones e inconsistencias en los testimonios de los testigos de cargo que, a su juicio, crearon duda razonable sobre su culpabilidad y (2) que el Ministerio Público no probó el *mens rea* requerido por el tipo delictivo. Veamos.

La prueba oral desfilada en el juicio por el Ministerio Público consistió en los testimonios del señor Martínez López y del señor Jesús Manuel Pérez Colón, Supervisor de la AEE. Por su parte, el señor Figueroa Jaramillo presentó como prueba su propio testimonio.

El señor Martínez López declaró, en síntesis, que el día de los hechos afiliados a la UTIER desarrollaron una manifestación en "la técnica" de Mayagüez de la AEE, específicamente en los dos (2) portones de acceso a la localidad, el vehicular y el peatonal, y que no permitían la

entrada ni la salida de nadie por los mismos. Que al mediodía sintió la necesidad de ingerir alimentos e invitó al señor Pérez Colón a que lo acompañara a salir de la instalación para almorzar. Que ambos se dirigieron al portón peatonal, dónde, según pudieron apreciar, había recesado la manifestación.[43]

Testificó, además, que tan pronto el señor Pérez Colón abrió el portón, un grupo de alrededor de veinte (20) unionados salieron del lateral del edificio de despacho, bloqueándoles la salida. Que éstos formaron un grupo compacto frente al portón y no les permitían salir. Que le expresó directamente al señor Figueroa Jaramillo, quien estaba al centro del grupo, y a quien reconocía como líder del gremio, que no era su intención "romper la actividad" sino "simplemente era ir a almorzar" y que no veía razón ninguna para que le impidiera almorzar.[44]

Declaró que, entonces, cuando trató de pasar "de la'o" entre los manifestantes, específicamente, entre el señor Figueroa Jaramillo y el señor Edgardo Galera, líder capitular de la UTIER en Mayagüez, recibió por su espalda un fuerte empujón de parte del señor Figueroa Jaramillo. Que a raíz del empujón, impactó una verja de tubos de acero que conecta con el portón, cayó al suelo y resultó con laceraciones sangrantes en su antebrazo derecho.[45] El señor Martínez López ilustró su

---

[43] Apéndice de la Petición de *Certiorari*, págs. 127-128.

[44] Íd., págs. 128-130.

[45] Íd., págs. 130-132, 142, 145 y 148.

testimonio en sala con dibujos, fotografías y representaciones corporales.

Por su parte, el señor Jesús Manuel Pérez Colón, en lo sucesivo señor Pérez Colón, declaró, en síntesis, que el día de los hechos, la UTIER se encontraba realizando una manifestación obrera en los portones de "la técnica" de Mayagüez de la AEE, lugar dónde trabaja. Que al mediodía se dirigió junto al señor Martínez López al portón peatonal para salir a almorzar, en momentos en que no se divisaba personal unionado manifestándose frente a éste. Que una vez abrió el portón, aparecieron los manifestantes, quienes se encontraban en el lateral del edificio de despacho, procediendo a formar, frente al portón, una cadena humana.[46]

Testificó que él, así como el señor Martínez López, se dirigieron verbalmente al señor Figueroa Jaramillo. Que le explicaron que no deseaban afectar la protesta, sino ingerir alimentos, porque ambos eran diabéticos. Que el señor Figueroa Jaramillo se mostraba "bien hostil y bien agresivo". Añadió, ilustrando su declaración con una fotografía, que mientras él continuó su diálogo con el recurrido, el señor Martínez López "se paró al lado" e intentó salir "por el lado izquierdo", "se dobló así para salir", recibiendo un empujón "por aquí, por frente" de parte del señor Figueroa Jaramillo.[47] Declaró que, producto del empujón, "se dió contra esta verja", cayendo al suelo, "saliendo con una laceración en el brazo

---

[46] Íd., págs. 162-164.

[47] Íd., págs. 165-166, 169 y 170.

derecho que [sic] hubo flujo de sangre", saliendo del lugar "prácticamente gateando", "entre las piernas de los demás compañeros".[48]

Por otro lado, el anterior Código Penal de 1974[49], aplicable a los hechos de este caso, dispone, en su artículo 94, que incurre en el delito de agresión "toda persona que empleare fuerza o violencia contra otra para causarle daño".[50] Los elementos del delito de agresión bajo ese Código son: 1) emplear fuerza o violencia contra una persona y 2) que se haga para causarle daño.[51] Nos comenta la profesora Dora Nevares Muñiz que del uso de la preposición "para" en el tipo delictivo se infiere que requiere la existencia de intención de causar daño.[52]

El artículo 14 del mismo cuerpo legal establece que nadie podrá ser sancionado por una acción u omisión que la ley provee como delito si no se realiza con intención o negligencia criminal. Añade que la intención o negligencia criminal se manifiestan por las circunstancias relacionadas

---

[48] Íd., págs 167-168.

[49] Derogado por la Ley Núm. 149 de 18 de junio de 2004, efectiva el 1 de mayo de 2005, conocida como Código Penal del Estado Libre Asociado de Puerto Rico, 33 L.P.R.A. sec. 4629 *et seq.*

[50] 33 L.P.R.A. ant. sec. 4031.

[51] Dora Nevares Muñiz, Código Penal de Puerto Rico, Revisado y Comentado, San Juan, Ed. Instituto para el Desarrollo del Derecho, Inc., 2000, págs. 176-177.

[52] Íd., pág. 177.

con el delito, la capacidad mental y las manifestaciones y conducta de la persona.[53]

Asimismo, el artículo 15 del derogado Código dispone que el delito se comete con intención criminal: a) cuando el resultado ha sido previsto y querido por la persona como consecuencia de su acción u omisión o b) cuando el resultado, sin ser querido, ha sido previsto o pudo ser previsto por la persona como una consecuencia natural o probable de su acción u omisión.[54] En el primer caso, "la persona tiene un deseo expreso de efectuar el acto y quiere la producción del resultado, el cual ratifica con su actuación".[55] Se trata de la denominada intención específica. En el segundo, la persona es penalmente responsabilizada por el resultado de su conducta, aunque no lo haya querido, siempre que éste sea previsible.[56] Se trata de la denominada intención general.

En Pueblo v. De Jesús, explicamos el concepto "intención general" enfatizando que:

> …no requiere prueba específica respecto a la intención, como en los casos de intención específica, sino que el comportamiento sea tal que demuestre una intención general de cometer el acto tipificado como delito. Tal intención se determinará de las circunstancias generales que rodean la conducta. El criterio determinante es si el resultado delictivo fue una consecuencia natural o probable de los actos del acusado… El criterio de previsión a utilizar será el del

---

[53] 33 L.P.R.A ant. sec. 3061.

[54] 33 L.P.R.A ant. sec. 3062.

[55] Pueblo v. Narváez, 122 D.P.R. 80, 90 (1988), citando a la profesora Nevarez Muñiz.

[56] Pueblo v. De Jesús, 119 D.P.R. 482, 489 (1987).

hombre/mujer prudente y razonable, sin importar lo que el sujeto particular previó.[57]

Debemos puntualizar que la moderna estructuración de nuestro derecho penal está cimentada en el principio de que quien ejecuta un hecho criminal es responsable de todo el mal que por consecuencia del mismo se produce.[58] La ley supone que toda persona intenta las consecuencias naturales de sus actos.[59]

Con base en ello, hemos resuelto que "cuando el daño corporal es resultado de la conducta ilegal de una persona, se presume su intención salvo que ésta demuestre lo contrario" (énfasis nuestro).[60] En Pueblo v. Castañón, caso de agresión mutilante, dijimos que "[t]oda la intención exigida es la que pueda inferirse de la naturaleza de las lesiones resultantes de ciertos actos intencionales".[61] En igual sentido, en Pueblo v. Astacio, caso de agresión, lo expresamos así:

> [p]ara que la intención exista basta que el daño corporal sea el resultado de la conducta ilegal de otra persona porque la ley supone que toda persona intenta las consecuencias naturales y razonables de sus actos voluntariamente ejecutados.[62]

**Por tanto, toda la intención requerida para que se configure el delito de agresión es la denominada intención**

---

[57] Íd., pág. 489.

[58] Pueblo v. Castañón Pérez, 114 D.P.R. 532, 539 (1983).

[59] Pueblo v. De León, 102 D.P.R. 446, 449 (1974).

[60] Pueblo v. De Jesús, *supra*, pág. 490; Pueblo v. Astacio, 23 D.P.R. 842, 844 (1916).

[61] 114 D.P.R. 532, 540 (1983).

[62] 23 D.P.R. 842, 844 (1916).

**general**. Esta conclusión no sólo está apoyada en el lenguaje del Código Penal de 1974, para el tipo delictivo en cuestión, y por la jurisprudencia antes expuesta, derecho que aquí aplicamos, sino que, inclusive, es cónsona con la reformulación del delito de agresión que se hizo en el nuevo Código Penal de 2004, que atiende, no únicamente la agresión intencional, sino, también, y por primera vez, la agresión por conducta negligente.[63]

Dicho esto, exponemos las contradicciones o inconsistencias en las declaraciones de los testigos de cargo que encontró el Tribunal de Apelaciones en su lectura de la transcripción del juicio, y que le crearon duda razonable sobre la culpabilidad del señor Figueroa Jaramillo.

El foro intermedio apelativo apreció que mientras el señor Martínez López había declarado que él fue el primero en salir por el portón peatonal, el señor Pérez Colón había testificado que él lo hizo primero. Asimismo, percibió que el señor Martínez López había declarado que el recurrido lo empujó por la espalda, mientras que el señor Pérez Colón había testificado que el empujón fue de frente. También, que mientras éste último había declarado que el señor Figueroa Jaramillo fue hostil y agresivo en el intercambio verbal, el señor Martínez López no se expresó en torno a ello.[64]

---

[63] Dora Nevares Muñiz, Código Penal de Puerto Rico, Revisado y Comentado, San Juan, Ed. Instituto para el Desarrollo del Derecho, Inc., 2004-2005, págs. 154-157.

[64] Apéndice de la Petición de *Certiorari*, pág. 32.

Por otro lado, esa misma lectura de la transcripción del juicio llevó al Tribunal de Apelaciones a apreciar que el Ministerio Público no probó la intención del señor Figueroa Jaramillo de causarle daño al señor Martínez López.[65]

**Las inconsistencias o contradicciones** en la prueba testifical que apreció y señaló en su sentencia revocatoria el foro intermedio apelativo **no versan sobre los elementos del delito** de agresión por el que se acusó al recurrido. Más bien, versan sobre detalles que no van a la médula del mismo. En todo caso, son pormenores que **inciden sobre aspectos de credibilidad que corresponde dirimir, aquilatar y adjudicar al juzgador de los hechos.**

Un análisis sosegado de las declaraciones vertidas en el juicio por **los testigos** Martínez López y Pérez Colón demuestra que éstos **se confirmaron o corroboraron mutuamente en cuanto a los elementos del delito** de agresión, esto es, sus testimonios coinciden en que el señor Figueroa Jaramillo empleó fuerza o violencia contra el primero con la intención de causarle daño.

Del estudio integrado de sus testimonios se colige, en esencia, que, a eso del mediodía del día de los hechos, ambos sintieron la necesidad de almorzar, y conociendo que los manifestantes no estaban permitiendo la salida de personas por el portón vehicular de la AEE, y apreciando que el portón peatonal se encontraba despejado en ese momento, se dirigieron a él para salir de la localidad. Se desprende, además, que una vez abierto el portón, una veintena de manifestantes

---

[65] Íd., págs. 31-32.

aparecieron, entre ellos el señor Figueroa Jaramillo, y les bloquearon la salida, mediante la formación, frente al portón, de una cadena humana. Que ambos testigos identificaron al recurrido como líder de la UTIER y **dialogaron pacíficamente con él, en un intento de convencerlo para que les permitiera salir a almorzar.** También, se colige que **al no tener éxito en esa gestión,** el señor Martínez López **inició su paso** entre los manifestantes, **lo que provocó que el señor Figueroa Jaramillo le propinara un fuerte empujón.** Que **producto de éste,** el perjudicado **impactó la verja** que conecta con el portón, **cayó al suelo y sufrió laceraciones sangrantes en su antebrazo derecho.**

En su "Escrito de Mostrar Causa", el señor Figueroa Jaramillo arguyó que "en el supuesto de que el recurrido haya agredido al Sr. Martínez, lo cual se niega, **no lo hizo con la intención de causarle daño".**[66] Que en todo caso, "lo empujó para repeler la invasión a su cuerpo pero **no para causarle daño".**[67] Aduce que el Ministerio Público falló en probar que la agresión se perpetró con la intención de causarle al perjudicado los daños descritos.[68] No nos persuade.

De la prueba de cargo, aquilatada, dirimida y creída por el juez sentenciador, surge que, como una reacción violenta a la determinación del señor Martínez Colón de salir por el portón en cuestión, el recurrido le propinó un empujón lo

---

[66] Escrito de Mostrar Causa, pág. 7.

[67] Íd., pág. 9.

[68] Íd.

suficientemente fuerte como para causarle el golpe, la caída y las laceraciones de su brazo derecho. Evidentemente, el señor Figueroa Jaramillo, en vez de usar un método pacífico y persuasivo para que el señor Martínez López desistiera de su intención de salir de las facilidades de la AEE, decidió imponerse por la fuerza y la violencia. Como hemos visto, el perjudicado tenía un legítimo derecho de libertad para moverse y lograr acceso a la vía pública. Es claro que con la intención de impedírselo, o como represalia por haberlo ejercido contra su voluntad, el señor Figueroa Jaramillo lo agredió físicamente.

Por ello, entendemos que el Ministerio Público probó más allá de duda razonable el estado mental de intención general requerido por el tipo delictivo de agresión. Según hemos apreciado, la intención de causarle daño al señor Martínez López surge claramente de las circunstancias que rodearon la conducta ilegal y voluntaria del señor Figueroa Jaramillo. Recordemos que en un caso de agresión, para probar intención general, basta que el daño corporal sea el resultado de la conducta ilegal de otra persona porque la ley supone que toda persona intenta las consecuencias naturales y razonables de sus actos voluntariamente ejecutados.

La sentencia revocatoria del Tribunal de Apelaciones nos mueve a reiterar que, de ordinario, al revisar un fallo de culpabilidad, en ausencia de error manifiesto, pasión, prejuicio o parcialidad, a los tribunales apelativos les está vedado intervenir con las determinaciones de hechos, basadas

en credibilidad, que hace el juzgador de los hechos.[69] La determinación de si la prueba presentada en el juicio en su fondo demuestra o no la comisión de determinado delito --lo cual es una cuestión de hecho-- compete exclusivamente al juzgador de los hechos.[70]

Recordemos que, inclusive, es norma jurisprudencial que la intención, como elemento subjetivo que es, constituye una "cuestión de hecho a ser evaluada por el juzgador de los hechos, Jurado o juez".[71] Así, salvo el caso de ausencia de prueba en el récord, los tribunales apelativos no tienen por qué intervenir con la apreciación que de la misma haga el juzgador de los hechos en cuanto al estado mental de intención.[72]

Es norma trillada que la determinación de culpabilidad que hace el juzgador de los hechos a nivel de primera instancia merece gran deferencia de parte de los tribunales apelativos. El fundamento en que se apoya la norma es obvio: dicho juzgador es el que, de ordinario, está en mejor posición para aquilatar la prueba testifical, toda vez que oyó y vio declarar a los testigos, siendo la observación el instrumento más útil para investigar la verdad.[73] En obediencia a esta norma de derecho, los tribunales apelativos no deben descartar

_____

[69] Pueblo v. Narváez, *supra*, pág. 91; Pueblo v. Maisonave, 129 D.P.R. 49 (1991).

[70] Pueblo v. Bonilla, 123 D.P.R. 434, 442 (1989).

[71] Pueblo v. Narváez, *supra*, pág. 90.

[72] Pueblo v. Montoya Montoya, *supra*, págs. 707-708.

[73] Pueblo v. Cabán Torres, 117 D.P.R. 645, 653-654 (1986).

arbitrariamente ni sustituir las determinaciones del foro primario por su propio criterio, formado con base en un expediente mudo y frío, a no ser que las mismas carezcan de fundamento suficiente en la prueba presentada.[74]

En eso precisamente estribó el error del Tribunal de Apelaciones. Sustituyó el fallo de culpabilidad, que hiciera el Tribunal de Primera Instancia, apoyado en prueba suficiente y satisfactoria, por su propia concepción y criterio de justicia, sin hacer señalamiento alguno demostrativo de que el foro primario hubiera incurrido en error manifiesto, pasión, prejuicio o parcialidad.

Por todo lo anterior, somos del criterio que incidió el foro intermedio apelativo al revocar la sentencia condenatoria por el delito de agresión dictada contra el aquí recurrido, señor Figueroa Jaramillo.

Por los fundamentos antes expuestos estoy conforme con la determinación de la mayoría de expedir el auto y revocar al Tribunal de Apelaciones, y al reinstalar el fallo de culpabilidad dictado por el Tribunal de Primera Instancia.


                                        *Efraín E. Rivera Pérez*
                                          *Juez Asociado*

---

[74] Pueblo v. Maisonave, *supra*, pág. 62.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

    Peticionario

       v.

Ángel Figueroa Jaramillo

    Recurrido

CC-2006-453

Opinión de conformidad emitida por la Juez Asociada señora Rodríguez Rodríguez a la cual se le une la Jueza Asociada señora Fiol Matta

San Juan, Puerto Rico, a 4 de mayo de 2007

Estoy conforme con la sentencia que emite el Tribunal en el día de hoy revocando la sentencia dictada por el Tribunal de Apelaciones. Escribo para expresar que la controversia central en este caso debió es si los elementos del delito imputado quedaron probados más allá de duda razonable. Nada más. Soy del criterio que es improcedente constitucionalizar la controversia del caso de epígrafe, por lo cual no coincido con la posición de varios de los integrantes de este Tribunal.

**I**

En junio de 2004 se presentó una denuncia contra el señor Ángel Figueroa Jaramillo, por infracción al

Artículo 95, agresión agravada grave, del Código Penal de 1974. En la misma, se le imputó que en mayo de 2004, ilegal, voluntaria, maliciosa y criminalmente empleó fuerza y/o violencia contra el señor Gilberto H. Martínez López, para causarle daño. Dicha acción consistió en haber empujado al Sr. Martínez contra una verja causándole laceraciones en el brazo derecho al caer éste al suelo; el perjudicado era mayor de 60 años. Este incidente ocurrió cuando el perjudicado se proponía salir de las instalaciones de la Autoridad de Energía Eléctrica (la "Autoridad") e intentó pasar por un cordón humano establecido por empleados de la Autoridad quienes se encontraban allí protestando.

Celebrada la vista preliminar, el tribunal encontró causa probable por el delito de agresión en su modalidad menos grave. Inconforme con tal determinación, el Ministerio Público solicitó sin éxito vista preliminar en alzada.

Así las cosas, el juicio se celebró en marzo de 2005. Durante el mismo, el Ministerio Público presentó el testimonio del perjudicado, Sr. Martínez y el Sr. Jesús M. Pérez, acompañante del perjudicado al momento de los hechos y quien era supervisor de la Autoridad de Energía Eléctrica. Ambos testigos declararon, en síntesis, que trabajaban para la Autoridad en la región de Mayagüez y que el 25 de mayo de 2004, durante unas protestas realizadas por los empleados de la Unión de Trabajadores de la Industria Eléctrica y de Riego (la "UTIER"), el Sr.

Martínez recibió un empujón por parte del acusado, que provocó que Martínez cayera al suelo y sufriera una laceración en su brazo derecho. Ambos testificaron que este incidente ocurrió cuando ambos abandonaban las instalaciones de la Autoridad a la hora de almuerzo e intentaban rebasar la línea de piquete que allí había establecido los miembros de la UTIER. Ambos testificaron que el empujón lo profirió el acusado.

Concluido el testimonio de los testigos de cargo, la defensa solicitó la absolución perentoria del acusado. El foro primario declaró sin lugar tal solicitud. El acusado entonces se sentó a declarar en su defensa. Testificó que su conversación con los señores Martínez y Pérez fue pacífica y que quien único se encontraba sobresaltado era el señor Martínez. Desfilada la prueba, el tribunal dictó sentencia condenatoria contra el acusado por el delito de agresión simple e impuso la pena de cien dólares ($100.00) de multa.

No conforme con dicha determinación, el Sr. Figueroa solicitó reconsideración. El foro primario denegó la misma y éste acudió ante el foro apelativo intermedio. En su recurso planteó que el Ministerio Público no probó los elementos del delito imputado más allá de duda razonable. El Tribunal de Apelaciones revocó al tribunal de instancia por entender que el testimonio de los testigos de cargo reflejó "[i]nconsistencias relacionadas con momentos medulares para determinar si en realidad concurrieron los elementos del delito imputado." Dicho foro concluyó que

"no se estableció en forma alguna la intención del acusado de causar daño a Gilberto Martínez López ya que ambos testigos de fiscalía afirmaron que el alegado empujón fue a raíz del intento de Gilberto Martínez López de atravesar entre los huelguistas."

Evidentemente inconforme, el Procurador General acudió ante nosotros. El pasado 20 de junio de 2006, dictamos una orden de mostrar causa dirigida al acusado, en la cual le indicamos que se expresara sobre el por qué no debíamos revocar la determinación del foro apelativo intermedio. Hoy, luego de evaluar los argumentos de las partes este Tribunal revoca, correctamente, al Tribunal de Apelaciones.

## II

### A

Discrepamos de la conclusión a que llegó el tribunal apelativo tanto en lo que respecta al elemento de intención así como al de credibilidad.

A poco que analicemos la sentencia dictada nos percatamos que al tribunal apelativo no le mereció credibilidad el testimonio de los testigos de cargo. El tribunal indicó expresamente en su sentencia que el testimonio vertido le provocaba insatisfacción, ambivalencia e indecisión, por lo cual entendía que dicho foro tenía duda razonable sobre lo ocurrido en cuyo caso procedía revocar al foro primario. El fundamento principal para dicha conclusión fue las alegadas inconsistencias en los testimonios de los testigos de cargo; principalmente, respecto cómo fue que ocurrió el empujón que sufrió el

señor Martínez. No compartimos en lo absoluto la preocupación del foro apelativo. Consideramos que sin duda, los elementos del delito imputado quedaron probados más allá de duda razonable. Además, las alegadas inconsistencias, cuando las hubo, fueron de carácter inconsecuente. El testimonio de los testigos de cargo no refleja elementos de incredulidad o inverosimilitud que requiera sea descartado.

Cabe destacar que al considerar la conclusión del Tribunal de Apelaciones sobre las alegadas inconsistencias en el testimonio de los testigos de cargo, lo hacemos conscientes de que **compete al juzgador de los hechos aquilatar la credibilidad de los testigos y determinar si la prueba presentada demuestra si se cometió o no el delito imputado**. En cuyo caso, salvo perjuicio, pasión, parcialidad y error manifiesto y, a menos que la apreciación de la evidencia se aleje de la realidad fáctica o la prueba sea inherentemente imposible o increíble, el tribunal apelativo debe abstenerse de intervenir con la apreciación de la evidencia hecha por el foro primario. Véase, *Pueblo v. Maisonave Rodríguez*, 129 D.P.R. 49, 62-63 (1991) y casos allí citados. Soy del criterio que la conclusión a que llegó el foro apelativo no se ajustó al estándar que hemos establecido para revocar una convicción.

El Tribunal de Apelaciones indicó que la alegada víctima testificó que lo empujaron por la espalda mientras que el señor Pérez, quien estuvo con la víctima al momento de los hechos, indicó que el empujón fue de frente. Lo que

a su juicio arroja dudas sobre lo que verdaderamente ocurrió y cómo ocurrió. El tribunal señaló también que quien inició la fuerza fue la alegada víctima al cruzar la línea de piquete. Esta última aseveración del foro recurrido crea la impresión de que es su criterio que lo ocurrido, de alguna forma, se debió al intento de la víctima de rebasar la línea de piquete y salir fuera de la Autoridad a la hora de almuerzo. Demás está decir que rechazamos esta sugerencia. No se requiriere decir nada más. Veamos entonces cuál fue el testimonio de los testigos de cargo para determinar si el mismo debe ser rechazado por imposible o increíble o si se aleja de la realidad fáctica de lo ocurrido para que amerite ser descartado.

**B**

A poco que revisemos pausadamente la transcripción de la vista en su fondo, nos percatamos que los testigos de cargo fueron tajantes al declarar que fue el señor Figueroa Jaramillo quien empujó bruscamente al señor Martínez cuando éste intentaba salir de las instalaciones de la Autoridad, provocando su caída y la laceración en el brazo derecho. Ambos testificaron también que el empujón lo recibió Martínez por el lado derecho de su cuerpo, como ya aseveramos

Sobre cómo ocurrió el empujón, el testimonio de la víctima fue el siguiente

> Eh, estando ellos al frente mío, metí, lo, la, las manos y el hombro simultáneamente para tratar de pasar de lado. En ningún momento traté de

> empujarlo, ni na' de eso.  Cuando, cuando me pongo así con el hombro para, para tratar de pasar la verja, está, a, a mi izquierda y ellos es que me empujan por el hombro, **por la espalda y el hombro del lado derecho**, pierdo el equilibrio y me di contra la verja, contra la verja que forma parte del portón.  (Énfasis nuestro.)

Apéndice a petición de certiorari, pág. 39.

De otra parte, el señor Pérez testificó que el señor Martínez, se encontraba frente a él, a su izquierda y que mientras él hablaba con Figueroa Jaramillo, "que de hecho estaba, ah, agresivo y hostil hacia nosotros, este, el señor Martínez intentó de salir [. . .] el señor Martínez trata de salir y ahí, eh, por el lado izquierdo, de frente por el lado izquierdo, y que a su  . . . recibe los empujones y sale por debajo de las piernas." *Ibíd.*, pág. 165.  El fiscal preguntó entonces, quién lo empujó y el testigo indicó que fue el Sr. Ángel Figueroa Jaramillo.  A renglón seguido, a la pregunta de por dónde lo empujó, éste indicó "**[p]or aquí, por frente**." *Íd.*, pág. 166.

Lo primero que llama nuestra atención es que no sabemos a qué se refiere "por aquí", pudiera ser el pecho como también la parte de al frente del hombro derecho. Después de todo, el señor Martínez testificó que él intentaba rebasar el cordón humano de lado, con su hombro derecho hacia el frente, por lo que el empujón "de frente" que recibió, muy bien lo pudo haber impactado en su hombro derecho y parte de su espalda como éste testificó. Obsérvese que el señor Martínez indicó que el empujón lo recibió por el hombro derecho y la espalda, todo ello perfectamente compatible con lo testificado por el señor

Pérez. El juez de instancia vio y escuchó el testimonio de los testigos, a éste le correspondía hacer las determinaciones de credibilidad.

Por otro lado, a nuestro juicio, las alegadas "inconsistencias" en otros renglones del testimonio vertido en sala no son de tal grado incompatibles entre sí que tornen el testimonio de los testigos de cargo en uno increíble o inverosímil. Como dijimos, el tribunal de instancia vio y escuchó el testimonio de los testigos por lo que claramente estaba en mejor posición para hacer las determinaciones de credibilidad correspondiente, lo cual hizo. Esa determinación nos merece la mayor deferencia y no debemos intervenir con ella ya que la misma no es inverosímil o imposible. A nuestro juicio, no procedía rechazar este testimonio como lo hizo el foro apelativo intermedio.

No encontramos por lo tanto, circunstancias algunas que podrían justificar la revocación de la sentencia del Tribunal de Primera Instancia por éste haber apreciado erróneamente la prueba, ni que dicha prueba fuera insuficiente en derecho para probar la culpabilidad del acusado más allá de duda razonable.

### III

### A

El Tribunal de Apelaciones indicó también en su sentencia que no se pudo establecer en este caso el elemento intencional del delito por lo cual procedía la absolución del acusado. Discrepo de dicha conclusión.

Conforme se desprende de la transcripción en este caso, fue el acusado quien empujó a la víctima provocando que ésta se cayera contra la verja y se lacerara el brazo derecho. Soy del criterio que de **los hechos del caso se desprende una intención general de cometer el delito del cual se le acusó por lo que procedía confirmar al foro primario**. Me explico.

**B**

El acusado fue hallado culpable de infringir el Artículo 94 del Código Penal de 1974. Este artículo dispone que "toda persona que empleare fuerza o violencia contra otra **para causarle daño** se le impondrá pena de multa que no excederá de quinientos dólares, pena de restitución, o ambas penas a discreción del tribunal." Los elementos del delito son: el empleo de fuerza o violencia contra una persona **y que ello se haga para causarle daño**. D. Nevares Muñiz, *Código Penal de Puerto Rico*, Instituto para el Desarrollo del Derecho, Inc., 2000, pág. 176. El delito, según definido, es del tipo que requiere la intención de causar daño, como elemento mental del mismo. W. LaFave, *Criminal Law*, Thomson-West, 4th ed., 2003, sec. 5.1. Debe establecerse además, la relación causal entre el empleo de fuerza o violencia y el daño que se le cause a la persona. Nevares Muñiz, *op. cit.*, pág. 177. Por lo tanto, a nuestro juicio, la controversia central es si a la luz de los hechos probados se configuró el elemento de intención necesario para incurrir en violación del Artículo 95.

El Artículo 15 del derogado Código Penal definía el delito intencional bajo dos modalidades; en la primera, disponía el artículo que se actuaba intencionalmente cuando el resultado delictivo había sido previsto y querido por la persona como consecuencia de su conducta. Bajo la segunda modalidad, la intención criminal se configura cuando el resultado delictivo, aunque no fue querido, fue previsto como consecuencia natural o probable de la acción u omisión realizada.

La primera de las modalidades o definiciones es lo que se conoce como la intención específica o de dolo directo o de propósito, en la doctrina civilista. **Actúa con dolo directo quien tiene como objetivo consciente realizar el acto constitutivo de delito.** "Para que concurra esta modalidad de la intención se requiere que el autor tenga el 'propósito' directo de producir el hecho delictivo." L. E. Chiesa Aponte, *Derecho Penal Sustantivo*, Publicaciones JTS, Inc., San Juan, 2007, pág. 144. Se requiere prueba específica respecto el elemento de intención. Estimo, que evaluada la prueba en este caso no se puede concluir que en efecto, el acusado tenía "el propósito directo" de causarle daño al señor Martínez con su empujón y que desfilara prueba a esos efectos.

De la transcripción de la prueba lo que surge es que la víctima y su acompañante trataban de disuadir a los manifestantes que los dejasen salir de las instalaciones de la Autoridad. Mientras el señor Pérez dialogaba con éstos, en particular con el señor Figueroa Jaramillo, el señor

Martínez aprovechó para rebasar el cordón humano y en ese momento recibió el empujón del acusado, cayendo hacia la verja y lacerándose su brazo derecho. Ello, sin más, no es suficiente par configurar la intención específica de causar daño que exige el Artículo 94 del Código Penal.

Procede en este momento evaluar si de estas circunstancias se desprende una intención general que permita concluir que se configuró el delito imputado. Como ya indiqué, sostengo que sí.

### C

En relación con el concepto de la intención general hemos expresado que la misma no requiere prueba específica respecto la intención, sino meramente exige de un comportamiento de tal naturaleza, que demuestre la intención general de cometer el acto tipificado como delito. Véase, *Pueblo v. Ruiz Rúiz,*125 D.P.R. 365 (1990); *Pueblo v. De Jesús Colón*, 119 D.P.R. 482, 489 (1987). Véase, D. Nevárez Muñiz, *Derecho Penal Puertorriqueño, Parte General*, Instituto para el Desarrollo del Derecho, Inc., Puerto Rico, 3ra. ed., 1995, págs. 185-188. Intención que se ha de determinar de las circunstancias que rodean la conducta. *Pueblo v. De Jesús*, *supra*. Siempre que el resultado de cierta conducta sea previsible, una persona deberá responder penalmente por dicho resultado.

Somos del criterio que evaluada la prueba de este caso, según relatada, se demuestra fehacientemente que se probó el factor intencional en su vertiente de intención general, para que se configurara el delito imputado. Lo

cierto es que el hecho de que el empujón que le propinara el acusado al señor Martínez ocurriera en el contexto de una disputa obrero-patronal, específicamente en un piquete, no es en modo alguno un eximente de responsabilidad como intima el acusado en su comparecencia.

Por las razones expresadas estoy conforme con la sentencia que hoy dicta este Tribunal.


                              Anabelle Rodríguez Rodríguez
                                   Juez Asociada